RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206

ELECTRONIC CITATION: 2001 FED App. 0331P (6th Cir.)
File Name: 01a0331p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

―――――――――――――

JOHN SWANSON, M.D.,
   *Plaintiff-Appellant,*

  *v.*

UNIVERSITY OF CINCINNATI
and UNIVERSITY HOSPITAL,
INC.,
   *Defendants-Appellees.*

No. 99-3993

Appeal from the United States District Court
for the Southern District of Ohio at Cincinnati.
No. 97-01143—Sandra S. Beckwith, District Judge.

Argued: June 6, 2001

Decided and Filed: September 20, 2001

Before: KEITH, SILER, and CLAY, Circuit Judges.

―――――――――――――

## COUNSEL

**ARGUED:** Teresa L. Cunningham, Florence, Kentucky, for Appellant. Rosemary Doreen Canton, TAFT, STETTINIUS & HOLLISTER, Cincinnati, Ohio, R. Kenneth Wellington II, GRAYDON, HEAD & RITCHEY, Cincinnati, Ohio, for Appellees. **ON BRIEF:** Teresa L. Cunningham, Florence,

Kentucky, Raul E. Tellez, SCHUH & GOLDBERG, Cincinnati, Ohio, for Appellant. Rosemary Doreen Canton, TAFT, STETTINIUS & HOLLISTER, Cincinnati, Ohio, R. Kenneth Wellington II, Bruce I. Petrie, Jr., GRAYDON, HEAD & RITCHEY, Cincinnati, Ohio, for Appellees.

---

## OPINION

---

SILER, Circuit Judge.   John D. Swanson appeals the district court's grant of summary judgment to the University of Cincinnati ("UC") and University Hospital, Inc. ("UHI") on his claims of employment discrimination based on disability under Titles I and II of the Americans with Disabilities Act ("ADA"), the Rehabilitation Act, and Ohio's anti-discrimination statute.

We **AFFIRM** the district court's decision that Swanson does not qualify as an individual with a disability under the ADA, the Rehabilitation Act, and the Ohio anti-discrimination statute. As a result, this court need not resolve the issues of whether Title II applies to employment discrimination claims against public entities or whether UHI is a proper defendant.

## I. BACKGROUND

After completing medical school at the University of Nevada, Swanson was accepted as a categorical general surgical resident at UC in May 1995.[1]   UC and Swanson entered into a one-year contract, running from July 1, 1995 to June 30, 1996, under which he received a salary and was covered by UC and the House Staff Association's collective bargaining agreement. UC accepts residents under the precept

---

[1]Completing the categorical residency is a prerequisite to board certification in general surgery.

under the criteria applicable to Title II of the ADA, this court need not resolve the question of whether Title II applies to employment discrimination claims in this case.

## C. UHI as a Proper Defendant

The district court did not address whether UHI is a proper defendant in this case. In his complaint, Swanson asserted that UHI was a successor in interest to UC's prior ownership and operation of the University of Cincinnati Hospital, and that its successor interest included his surgical residency contract. The record does not offer any evidence about UHI and UC's contract or whether the parties distinguished between succession in interest and liability. Thus, to determine whether UHI and Swanson had an employer-employee relationship under Title I of the ADA, this court applies the common-law agency test and the master-servant relationship articulated in *Johnson v. City of Saline*, 151 F.3d 564, 568 (6th Cir. 1998) (relying on *Nationwide Mut. Ins. Co. v. Darden*, 503 U.S. 318, 323-24 (1992)).

Under *Johnson*, we consider "the entire relationship, with the most important factor being the 'employer's ability to control job performance and employment opportunities of the aggrieved individual.'" *Id.* at 568. While UHI was assigned UC's interest in the surgical residency contracts, UC maintained the day-to-day administration, admission, operation, education, evaluation, discipline and decision-making functions for the surgical residency program. Swanson has not shown that the physicians involved in the termination decision were employees of UHI or that UHI had any control over or was involved in the October 1996 decision not to renew his contract. The evidence fails to show that UHI had an employer-employee relationship with Swanson. Further, Swanson's claims fail as Swanson did not request accommodation from UHI; he does not qualify as disabled under any of the statutes asserted; and he cannot demonstrate that UHI's actions were a pretext for discrimination.

**AFFIRMED.**

that they will complete their program if they meet expectations.

UC's surgical residency program typically involves five years of practicing medicine and treating hospital patients as well as two years of laboratory research. During the first year, Swanson had 30-day rotations in general surgery, thoracic surgery, transplantation, pediatric surgery, trauma, and burns at various hospitals in Cincinnati. After each rotation, the attending doctors and chief residents of the service completed a performance evaluation for each resident in the areas of patient care and clinical judgement, medical knowledge, technical and procedural skills, attitude and professional behavior, and medical record. Performance ratings include 1 for distinctly superior to other residents, 2 for at times superior to other residents, 3 for similar to other residents, 4 for at times below other residents, and 5 for clearly below other residents. Residents also receive numerical grades with 100-95 as outstanding, 94-90 as very good, 89-85 as good, 84-80 as adequate, and 79 and lower as below adequate.

During his July 1995 rotation in thoracic surgery, Swanson's sole evaluator assigned him a 1 for attitude and professional behavior, 2's in the other categories, and a grade of 95, noting no weaknesses. His ratings dropped during his transplantation rotation. One reviewer gave him 3's in the first three categories and 2's in the last two, with an overall score of 94. The second reviewer assigned him 4's in the first two categories and 3's in the last two, with a score of 85. The second reviewer commented that Swanson had a strong work ethic, but "seemed overwhelmed at times" and was "very slow to pick up how to get the work done."

From September to December 1995, Swanson's evaluations from his surgery rotations included 1's or 2's for attitude and professional behavior, but fluctuated between 3 and 4 in the areas of patient care and clinical judgment, medical knowledge, and technical and procedural skills. Most reviewers noted deficiencies in his technical and organizational skills, particularly prioritization. During this

time, Swanson took the American Board of Surgery Basic Science/In-Training Examination, a standardized test measuring general surgery knowledge, and scored poorly.

From January to April 1996, Swanson had rotations with pediatric surgery, VA medical service, and thoracic surgery. He received two 2's, three 3's, and a 5 for technical and procedural skills; three 2's, two 3's, and a 3-4 in medical knowledge; and two 2's, two 3's, and a 3-4 and 4 in patient care and clinical judgement. Scores in attitude and professional behavior and medical record ranged from 1 to 4. Some reviewers noted no weaknesses, while others criticized his aggressive approach in managing staff, deficient technical skills, and ineffective organizational skills. His numerical scores ranged from 88 to 95.

In May 1996, Dr. Bower conducted Swanson's first six-month evaluation based on his performance reviews and his standardized test score. Finding Swanson's performance to be "below the level expected," Dr. Bower placed him on academic probation until September 30, 1996. He also recommended counseling to improve Swanson's methods of study and ability to organize and prioritize tasks in patient care. Swanson was also informed that at the end of probation, a decision would be made whether to extend his academic probation or discontinue his residency training.

From May to June 1996, Swanson's evaluations dropped significantly on his burns and surgery rotations. He received a 4-5 and four 5's in patient care and clinical judgment, a 3 and four 4's in medical knowledge, and two 3's and a 4 in technical and procedural skills. His score for medical record hovered at 3 and attitude and professional skills ranged from 3 to 5. His overall score was between 70 and 80.

Based on the recommendation of Dr. Fischer, who evaluated him in June, Swanson sought help from Dr. Barker, a psychiatrist in July. She diagnosed him as suffering from major depression arising from the break-up of a significant four-year relationship, his parents' separation while he was in college, and other personal losses. Swanson told Dr.

was not Swanson's employer, and she did not recommend that Swanson seek a medical leave of absence to assist his treatment until 1997, nor seek changes in his scope of practice because of his impairment. In her letter submitted at UC's internal hearing, she only stated that it was reasonable to expect his performance to improve markedly over the next six to nine months due to treatment. In addition, nothing in the record reflects Swanson's characterization of Dr. Barker's opinion.

According to *Sutton*, "it is necessary that a covered entity entertain misperceptions about the individual – it must believe either that one has a substantially limiting impairment that one does not have or that one has a substantially limiting impairment when, in fact, the impairment is not so limiting." 527 U.S. at 489. Swanson's supervising physicians recognized that his depression was an impairment but did not perceive it as significantly restrictive of his work as a physician *per se*. By offering academic assistance and encouraging him to shift to another area of practice, Dr. Bower and other members of the UC staff perceived Swanson as a capable physician, just not a capable surgeon under UC's program. Thus, as Swanson was not substantially limited in any major life activity asserted, he does not qualify as disabled under the Rehabilitation Act or Ohio law.

## B. Title II Claim

Swanson also pursues an employment discrimination claim under Title II of the ADA.[7] While the district court held that Title II does not apply to employment discrimination suits based on *Parker v. Metropolitan Life Ins., Co.*, 121 F.3d 1006 (6th Cir. 1997) (*en banc*), Swanson contends that Title II is applicable based on *Johnson v. City of Saline*, 151 F.3d 564 (6th Cir. 1998). As Swanson does not qualify as disabled

---

[7] Title II states that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132.

abilities that the individual is likewise disqualified from because of the impairment. *See* 29 C.F.R. § 1630.2(j)(3)(ii).

Considering these factors, the district court ruled that Swanson's depression did not substantially limit his ability to work because he did not miss any days of work, his reviewers consistently noted he worked hard, and his University of Nevada record demonstrated that his impairment was short-term because, with proper medication, he gave a "solid" performance.

Swanson's move to Nevada greatly extended the geographical area for analysis. His record at the University of Nevada shows that he could perform similar surgical residency jobs requiring similar training and skills as those at UC. During his UC residency, Swanson performed well in some rotations but not so in others. Basically, he demonstrates that he did not perform as expected in a single, particular job, but could perform in a class of medical jobs.

Finally, Swanson claims that UC and UHI regarded him as disabled because they terminated him before he fully benefitted from his treatment. Under 29 C.F.R. § 1630.2(k), an individual "regarded as having [] an impairment" means that the individual: "1) [h]as a physical or mental impairment that does not substantially limit major life activities but is treated by a covered entity as constituting such limitation; 2) [h]as a physical or mental impairment that substantially limits major life activities only as a result of the attitudes of others toward such impairment; or 3) [h]as [no physical or mental impairment] but is treated by a covered entity as having a substantially limiting impairment."

Swanson's complaint generally alleges that UC regarded him as disabled, and his brief focuses on work as the major life activity. The district court held that under *Kocsis,* Swanson did not show that UC perceived that he was disqualified from performing a broad range of jobs. Swanson asserts that the district court erred by ignoring Dr. Barker's opinion that his work performance would be significantly restricted in any medical or non-medical job. But Dr. Barker

Barker that he had been experiencing poor concentration, an inability to speak, tearfulness, and feeling withdrawn and exhausted. He stated that he only slept four to five hours per night, but his sleep was not disturbed. In her mental status exam, Dr. Barker found that Swanson's thought processes were logical and coherent, and he was cognitively intact.

Though he resisted at first, Swanson began to take Paxil, an antidepressant, on July 23, and his condition improved. Because his medication had a sedative effect, Dr. Barker switched him to Prozac on August 12. During the transition, Swanson's symptoms recurred and his dosage was increased until it was therapeutically effective. Dr. Barker states that Prozac's optimal effect occurs after a four week period.[2] Swanson also had therapy sessions with Dr. Barker in July and August, 1996, but none between early August and November due in part to his work schedule.

From July to September, Swanson's surgery and trauma rotations yielded mediocre reviews. He received a 2, two 3's, three 4's, and two 5's for patient care; a 2, three 3's, two 4's and two 5's for medical knowledge, and two 2's, two 3's, a 3-4, and two 4's for technical skills. Some reviewers noted continuing problems with organization and prioritization, bad rapport with other hospital staff, and unreliable clinical assessments, while others noted improvements in his patient care and medical knowledge. His overall scores ranged from 79 to 91.

During his September 11 meeting with Dr. Bower regarding his progress, Swanson stated that he believed his medication was helping his concentration and that his clinical performance had improved. From his observations during this meeting, Dr. Bower believed that the counseling and medication had improved Swanson's attitude and ability to converse. Subsequently, Dr. Bower received Swanson's July

---

[2]The record is vague on when Swanson's Prozac had a therapeutic effect. Dr. Barker states that Swanson was beginning to respond optimally to his medication when he was terminated in October 1996.

to August evaluations which demonstrated some improvement in medical knowledge but Swanson's organizational skills, clinical assessment abilities, technical skills, and rapport with staff were deficient. On September 17, the Residency Review Committee approved Dr. Bower's recommendation to terminate Swanson's residency. When Swanson and Bower met on September 25, Bower informed him that his probation was extended for at least another month but most likely, his contract would not be renewed. Based on Swanson's evaluations, Dr. Bower pointed out that he improved while working in a structured environment but his performance deficiencies reappeared when he was assigned to a busy service with numerous patients. Dr. Bower recommended that because surgery may not be the best fit, Swanson should consider applying to another specialty for a residency.

Swanson's October evaluations from his trauma rotation demonstrated no improvement from prior months. He received two 4's and a 4.5 in patient care; a 3, 4.5, and 5 in medical knowledge, and a 3 and two 4's in technical skills. His numerical score fell between 79 and 84. On October 24, Dr. Bower presented the Resident Review Committee's termination recommendation to the entire faculty and it was approved. Swanson was informed that the faculty's decision to terminate his appointment was effective by letter on October 31, 1996, and that he could present additional information at an internal hearing scheduled to review his termination on November 6. In addition, the letter stated that his salary and benefits would continue through November 14. Dr. Bower also relieved him of his clinical duties. Swanson contacted Dr. Barker regarding his dismissal and her notes state that he was calm and cognitively intact.

At the internal hearing, Swanson appeared with his union representative before Drs. Bower, Fischer, Hurst, and Fegelman. The union representative requested that Swanson be reappointed and presented a letter from Dr. Barker stating that his first year of residency was strongly affected by his depression and it was reasonable to expect improvements in

as a whole when determining whether a genuine issue of material fact has been raised. Considering Swanson's medical school and residency records, he performed consistently well at the University of Nevada. However, at UC, he did not perform to the caliber of his peers or the program's standards.[6] Before and after treatment, Swanson's ratings in medical knowledge and technical skills were higher under some physicians on certain rotations at UC while they dropped with others. Taken as a whole, his medical training record shows that his depression impacted, but did not significantly restrict, the condition, manner, or duration of his ability to concentrate. *See Sutton*, 527 U.S. at 488. Overall, Swanson's vague allegation of the unknown duration of his depression and effects of his medication, when viewed with the demonstrated effects of his treatment, fails to establish that he was substantially limited in his sleep, concentration, or communication. *See Roush*, 96 F.3d at 844.

Swanson also argues that he was substantially limited in his ability to work. In regard to work, "substantial limitation" means "significantly restricted in the ability to perform either a class of jobs or a broad range of jobs in various classes as compared to the average person having comparable training, skills and abilities. The inability to perform a single, particular job does not constitute a substantial limitation in the major life activity of working." 29 C.F.R. § 1630.2(j)(3)(i). Additional factors to consider in evaluating substantial limitation in working are: 1) the geographical area within the individual's reasonable access; 2) the job disqualified from because of the impairment and the number and types of jobs in the geographical area that require similar training knowledge, skills or abilities that the individual is likewise disqualified from because of the impairment; and/or 3) the job disqualified from because of the impairment and the number and types of other jobs in the geographical area that do not utilize similar training, knowledge, skills or

---

[6] Swanson recognized that UC had a more demanding, higher ranked surgical residency program than the University of Nevada.

F.3d 840, 844 (6th Cir. 1996), this court considered the fact that the plaintiff's kidney condition had been corrected by treatment and no longer affected her ability to work, a result occurring after the time of the discriminatory acts, in determining that this condition was temporary and not substantially limiting. Further, *Roush* ruled that the mere possibility that an adverse health condition could recur or require further treatment was not sufficient to establish that the condition was substantially limiting. *See id.*

Under *Sutton*, the Supreme Court recognized that "one has a disability under [§ 12102(2)(A)] if, notwithstanding the use of a corrective device, that individual is substantially limited in a major life activity." 527 U.S. at 488. For example, "individuals who take medicine to lessen the symptoms of an impairment so that they can function but nevertheless remain substantially limited" qualify as disabled. *Id.* "The use or nonuse of a corrective device does not determine whether an individual is disabled; that determination depends on whether the limitations an individual with an impairment *actually* faces are in fact substantially limiting." *Id.*

Inferring the evidence in Swanson's favor, it shows that he was impaired in his sleep and communication by his depression but not substantially limited. His own statements and actions show that when he was on Paxil and Prozac, the quality of his sleep improved and he recovered his communication abilities. While less than five hours sleep is not optimal, it is not significantly restricted in comparison to the average person in the general population. The evidence also shows that he was not "mentally totally dysfunction[al]" and unable to speak for an unknown amount of time, but rather that these restrictions were corrected before his termination. *See id.*

In regard to his concentration, inferences from Swanson's performance record at the University of Nevada should be made in his favor, but no rule requires a court to examine it only for the purpose intended by Swanson. Rather, Fed. R. Civ. P. 56(c) demands that a court consider all the evidence

his performance over the next six to nine months. When the review committee declined to reinstate Swanson, his union representative requested that he receive a medical leave of absence for an unspecified time due to his depression. This request was denied on the grounds that a surgical residency could not be interrupted and must be completed through consecutive years of training. On November 20, 1996, Swanson again asked for a meeting to discuss accommodations but was denied.

On January 1, 1997, UC leased its assets and interest, including Swanson's surgical residency contract, in the University of Cincinnati Hospital to UHI. Because Swanson and UC attempted to negotiate a settlement regarding his termination, his salary and benefits continued until June 30, 1997, when UC advised UHI that Swanson had not been reappointed. Since that time, Swanson obtained a preliminary residency in general surgery with the University of Nevada School of Medicine and has given a "solid performance."[3]

Swanson filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC") alleging that UC and UHI had terminated him on the basis of his disability, major depression, and denied his request for accommodation. He later filed his initial complaint in the district court. According to his amended complaint, Swanson asserts employment discrimination claims against UC and UHI under Title I and II of the ADA, 42 U.S.C. §§ 12112(a), 12132; the Rehabilitation Act, 29 U.S.C. § 794; and Ohio Rev. Code § 4112.01 *et seq.* for terminating his residency on the basis of his disability and refusing his requests for reasonable accommodations. UC and UHI filed a motion for summary judgment.

In applying the similar *prima facie* standard for employment discrimination under Title I, the Rehabilitation Act, and Ohio Rev. Code § 4112.02(A), the district court

---

[3] A preliminary residency does not lead to board certification.

ruled only on whether Swanson's condition qualified him as disabled. The district court ruled that Swanson's major life activities were not substantially limited by his condition because any restrictions were short-term in nature and mitigated by medication. In addition, his limitations were no greater than those experienced by the average person. Swanson also alleged substantial limitation in his ability to work. The district court noted that he did not miss any days of work; "his reviewers consistently noted he was able to work hard, even at the peak of his illness"; and his record at the University of Nevada indicated Swanson could give a "solid" performance in surgery with proper medication. Based on these factors, it held that his depression had only a short-term effect on his performance and he was not substantially limited in the major life activity of working. Further, the district court dismissed the Title II claim stating that in *Parker v. Metropolitan Life Ins. Co.*, 121 F.3d 1006, 1014 (6th Cir. 1997) (*en banc*), this circuit ruled that Title II does not cover employment discrimination.

Finding that the defendants did not believe Swanson was disqualified from performing a broad range of jobs, but rather encouraged him to switch to another medical speciality, the district court rejected his claim that UC and UHI regarded him as disabled. Finding that Swanson was not disabled within the meaning of the three statutes, the district court granted summary judgment to UC and UHI.

## II. STANDARD OF REVIEW

This court reviews *de novo* the district court's grant of summary judgment to defendants. *See Cehrs v. Northeast Ohio Alzheimer's Research Ctr.*, 155 F.3d 775, 779 (6th Cir. 1998). Under Federal Rule of Civil Procedure 56(c), summary judgment is appropriate if "the pleadings, depositions, answers to interrogatories, and admissions on file together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

success from medical school to his residency demonstrates the severe impact of his depression on his ability to concentrate, which impacted his organizational, reading, and learning skills. He also asserts that the district court could not use his University of Nevada record to find he was not substantially limited in his concentration because it arose after his termination and was submitted to show he could perform the job duties of a surgical resident.

Again, the district court ruled that his communication dysfunction was short-term due to his medication and constituted only a few individual episodes of no greater duration than what an average person might experience. In response, Swanson cites his affidavit stating that his depression "extinguished [his] ability to communicate at all levels." He also argues that the duration of his inability to communicate was unknown and indefinite, and his condition was severe based on Dr. Fischer's description that he was "mentally totally dysfunction[al]" and needed psychiatric care.

Swanson contends that when he was terminated in October 1996, the results of his treatment regime were unknown because he had not yet reached the optimal effect of his Prozac dosage. Because his evidence shows that his depression was so severe and the duration of his condition was unknown, he asserts that he establishes a genuine issue of material fact regarding his substantial limitation in these activities.

Swanson misconstrues Sixth Circuit precedent and *Sutton* regarding the meaning of "presently" in determining disability and the scope of a court's consideration of mitigating factors. First, *Kocsis,* 97 F.3d at 879-80, 884, dealt with a plaintiff that was diagnosed with multiple sclerosis after the adverse employment action. Thus, this court held that a plaintiff had to establish disability at the time of the discriminatory acts to recover under the ADA. *Kocsis* does not restrict the court to look only at the plaintiff's condition up to the time of the discriminatory action. Rather, in *Roush v. Weastec, Inc.*, 96

3.  the permanent or long term impact, or the expected permanent or long term impact of or resulting from the impairment.

29 C.F.R. § 1630.2(j)(2).

Taking into consideration mitigating measures, the district court ruled that if Swanson was restricted in his ability to perform these activities, the restriction was short-term in nature because of his medication and thus not substantially limiting. Even without considering mitigating factors, it held that Swanson was no more restricted than an average person in performing these activities. Under *Sutton*, the Supreme Court held that "if a person is taking measures to correct for, or mitigate, a physical or mental impairment, the effects of those measures – both positive and negative – must be taken into account when judging whether that person is 'substantially limited' in a major life activity." 527 U.S. at 482. The Court also interpreted "substantially limits" to require that "a person be presently – not potentially or hypothetically – substantially limited in order to demonstrate a disability." *Id.*

Swanson argues that the district court misconstrued *Sutton* to mean that it should evaluate his condition as of the date of his summary judgment response in March 1999, or its Order, July 9, 1999. He asserts that *Sutton* actually requires the court to determine whether he was substantially limited at the time of his termination only. While the district court focused on the amount of sleep he had and improvements from his medication, Swanson argues that his depression significantly restricted both the quantity and quality of his sleep during his first year of residency.

In concluding that Swanson's inability to concentrate was short-term and alleviated by drugs, the district court relied on his statements to Dr. Bower that his medication enabled him to follow patients more clearly and improved his reading and retention skills as well as his performance at the University of Nevada. Swanson argues that the change in his academic

## III. DISCUSSION

### A. Claims under the ADA, Rehabilitation Act, and Ohio law

In his complaint, Swanson seeks monetary damages from UC based on its alleged violation of Title I of the ADA. UC is a public entity operated by the State of Ohio as an institution of higher learning. In *Board of Trustees of the Univ. of Alabama v. Garrett*, the Supreme Court held that the Eleventh Amendment bars "suits by private individuals for money damages under Title I." 121 S. Ct. 955, 968 n.9 (2001).[4] Based on *Garrett*, Swanson's Title I claim against UC is barred.

Swanson's employment discrimination claims under the Rehabilitation Act and Ohio Rev. Code § 4112.02(A) are not barred and are analyzed under criteria similar to Title I claims. *See Monette v. Electronic Data Sys. Corp.,* 90 F.3d 1173, 1177-78 (6th Cir. 1996) (stating that the analysis of claims under the ADA and Rehabilitation Act are similar and citing *Maddox v. Univ. of Tennessee,* 62 F.3d 843, 846 n.2 (6th Cir. 1995)). To establish a *prima facie* case of employment discrimination based on disability, the plaintiff must show that:

1.  He is an individual with a disability according to the statute;
2.  He is "otherwise qualified" to perform the job requirements, with or without reasonable accommodation;
3.  He suffered an adverse employment decision;
4.  The employer knew or had reason to know of his disability; and

---

[4] The Court goes on to state that Title I still prescribes certain standards to the States that are enforceable by the United States in actions for money damages or by private citizens in actions for injunctive relief. *See Garrett*, 121 S. Ct. at 968, n.9.

5.  The position remained open after the adverse employment decision or the disabled individual was replaced.

*See Monette,* 90 F.3d at 1185.  In addition, the plaintiff must establish that the relevant program or activity is receiving federal financial assistance under the Rehabilitation Act.  *See Maddox*, 62 F.3d at 846.

When a plaintiff establishes a *prima facie* case of employment discrimination, the employer then bears the burden of production and must "assert a legitimate, non-discriminatory justification for its action."  *Monette,* 90 F.3d at 1179.  If the employer presents evidence of a legitimate reason for the adverse action, the burden returns to the employee who must show that the proffered explanation is a pretext for the employer's unlawful discrimination.  *See id.*

In this case, the question is whether Swanson is disabled under the federal and state statutes.  The ADA, the Rehabilitation Act, and the Ohio anti-discrimination statute define disability as:

1.  a physical or mental impairment that substantially limits one or more of the major life activities of an individual;
2.  a record of such impairment; or
3.  being regarded as having such an impairment.

*See* 42 U.S.C. § 12102(2); 29 U.S.C. § 12102(2); Ohio Rev. Code § 4112.01(A)(13).

While Congress has not assigned authority to a federal agency to issue regulations defining the terms "mental impairment," "substantially limits," or "major life activities," the parties accept the EEOC's regulatory interpretation of these terms and this court assumes 29 C.F.R. § 1630.2(h), (i), and (j) are reasonable.  *See Sutton v. United Air Lines*, 527 U.S. 471, 479, 492 (1999).  The district court assumed, and the parties do not dispute, that major depression is a mental impairment.  *See Pritchard v. Southern Co. Servs.*, 92 F.3d

1130, 1132 (11th Cir. 1996); *see also Kocsis v. Multi-Care Management, Inc.*, 97 F.3d 876, 884 (6th Cir. 1996) (citing *Miller v. Nat'l Cas. Co.,* 61 F.3d 627, 630 (8th Cir. 1995) which recognized a manic depressive condition as a mental impairment). In regard to major life activities, the district court and parties also assume that sleeping, concentrating, communicating, and working are major life activities.[5]

The major dispute focuses on whether Swanson's depression substantially limits these major life activities. Substantially limits means:

1.  *unable* to perform a major life activity that the average person in the general population can perform; or
2.  *significantly restricted as to the condition, manner or duration* under which an individual can perform a particular major life activity as compared to the condition, manner, or duration under which the average person in the general population can perform that same major life activity.

29 C.F.R. § 1630.2(j)(1) (emphasis added).

Swanson argues that he was significantly restricted in his ability to sleep, concentrate, and communicate. Factors that should be considered in determining if he qualifies as substantially limited in these major life activities include:

1.  the nature and severity of the impairment;
2.  the duration or expected duration of the impairment; and

---

[5] Under the ADA regulation, "major life activities" include speaking, learning, and working. *See* 29 C.F.R. § 1630.2(i). But the Supreme Court questioned the inclusion of working as a major life activity in *Sutton,* 527 U.S. at 492, and the district court noted that the Tenth Circuit ruled that communication was not a major life activity in itself in *Pack v. KMart Corp.*, 166 F.3d 1300, 1305 (10th Cir. 1999).