[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 06-12692
_____

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
AUGUST 24, 2007
THOMAS K. KAHN
CLERK

D. C. Docket No. 02-2289-CV-5-VEH


BOB NADLER,

                                        Plaintiff-Appellant,

versus

FRANCIS J. HARVEY,

                                        Defendant-Appellee.


_____

Appeal from the United States District Court
for the Northern District of Alabama

_____

**(August 24, 2007)**

Before EDMONDSON, Chief Judge, HULL, Circuit Judge, and FORRESTER,[*]
District Judge.

---

[*]Honorable J. Owen Forrester, Senior United States District Judge for the Northern
District of Georgia, sitting by designation.

FORRESTER, District Judge:

Appellant, Bob Nadler, appeals from the district court's order granting summary judgment in favor of Appellee, Francis Harvey, Secretary of the Army, on his claims pursuant to the Rehabilitation Act of 1973 ("the Act"), 29 U.S.C. § 791, § 501, as amended; 29 U.S.C. §§ 791 and 794. Nadler alleges that his supervisor, James Newell, (1) refused to accommodate his insomnia and depression with a flexible work schedule, (2) refused to accommodate his back injury by allowing him to work while standing, and (3) discriminated against him by improperly handling his absences because of his disabilities.[1] The district court found that Nadler had not presented evidence sufficient to create a genuine issue of a material fact as to whether his impairments "substantially limited a major life activity" and rendered him disabled within the meaning of the Act. Further, the district court concluded that even if Nadler had adequately proven his disability, his claim should fail because he had not presented sufficient evidence under the burden-shifting framework of *McDonnell Douglas v. Green* that the non-discriminatory reasons for its actions asserted by the Defendant were pretextual.

---

[1]Before the district court, Nadler also alleged that the Army retaliated against him for engaging in protected activity in violation of Title VII of the Civil Rights Act of 1964, as amended; 42 U.S.C. §§ 2000e, *et seq*. The district court determined that Nadler had produced no evidence to establish a prima facie case of retaliation. Nadler does not raise his retaliation claim on appeal and we deem it waived. *McFarlin v. Conseco Servs., LLC*, 381 F.3d 1251, 1263 (11th Cir. 2004).

For the reasons set forth below, we affirm the district court's grant of summary judgment and hold that (1) sleep is a major life activity; (2) a plaintiff is not substantially impaired in sleeping when he sleeps an average of five and a half to six and a half hours per night and his sleep patterns do not differ significantly from those experienced by the general population; and (3) the Title VII burden-shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 793 (1973), while appropriate for determining the existence of disability discrimination in disparate treatment cases, is not necessary or useful in determining whether a defendant has discriminated by failing to provide a reasonable accommodation.

## I.    Backgound

Bob Nadler is a civilian employee of the Department of the Army who works as a GS-12 Operation Research Analyst at Redstone Arsenal in Huntsville, Alabama. Between the spring of 1994 and the fall of 2002, Nadler worked under the immediate supervision of James Newell, and Newell was responsible for Nadler's work and leave schedules. During this period Nadler was treated for sleep disorder, depression, and back pain.

### A.    Nadler's Impairments

Newell became aware of Nadler's problems with insomnia soon after he began supervising Nadler in 1994. Nadler was experiencing difficulty arriving at

3

work on time. He provided medical documentation from a sleep clinic, and Newell placed him on a modified compressed work schedule. A psychologist who treated Nadler from January 1999 to October 2003 testified that Nadler "had suffered from insomnia for a number of years" and that his symptoms could not be completely mitigated with medication. The psychologist responded affirmatively when asked if Nadler's condition was severe. Nadler's psychiatrist wrote a letter in 1999 stating that Nadler suffered from "disordered sleep resulting in extreme fatigue and chronic sleep deprivation" and that his condition was "severe" and "unremitting."

Nadler himself testified he had been treated for insomnia and depression continuously since 1988 and had attended six sleep clinics and seen numerous sleep specialists. He testified that his sleep without medication was "very fragmented and [was] only two to three hours per night," and his sleep with medication "[was] only four hours per night on a fragmented basis." Sleep studies, conducted in 1990 and 1995, indicated that Nadler slept an average of five and a half to six and a half hours per night, as little four hours on one night, and as long as seven and a half hours on other nights. Nadler's sleep quality ranked between fifty and eighty percent on a 1-100% scale of very poor to very good.

Three nocturnal polysomnograms indicated that Nadler slept for 4.9 hours, 2.1 hours, and 5.6 hours, respectively.

Nadler also provided Newell with documentation of depression in 1999. Letters from Nadler's psychologist, written in July 2001 and January of 2002, recommended reassignment and indicated that Nadler was suffering from stress. A January 2001 letter from Nadler's treating psychiatrist stated that Nadler suffered from "recurrent, and treatment-resistent major depression" resulting in "disordered sleep."

Nadler also claimed to have suffered from severe back pain while under Newell's supervision. Nadler testified that he had a back condition known as grade II Spondylolisthesis, which had been confirmed by X-ray, CAT scan, myelogram and MRI. He complained of chronic low back pain and sciatica related to disc disease. A "Physical Activity Report" signed by Nadler's physician noted that he should avoid "prolonged sitting" for a four-week period. Nadler presented further recommendations from medical care providers made in June and September of 2000 and July of 2001 stating that he should "change posture as needed," "change positions or stand as needed," and should be limited to occasional sitting. In August of 2001, Nadler sustained an additional back injury at work. His treating chiropractor estimated his recovery period to be eight to

twelve weeks. Nadler took time off from work and received worker's compensation. He returned to limited duty in February of 2002. A letter from Nadler's chiropractor in October of that year stated that Nadler should continue to take short breaks from sitting in order to stand up and walk around.

**B.     Incidents of Discrimination**

Nadler alleged that Newell discriminated against him on four occasions between 1994 and 2002 when Newell: (1) requested that Nadler present medical documentation before returning to work from leave in 1999; (2) terminated Nadler's modified compressed work schedule in 1999; (3) instructed Nadler that he must work from his desk rather than standing up in 2000; and (4) designated Nadler as away without leave during 2001.

In January of 1999 Nadler provided Newell with documentation indicating that he was under a doctor's care for extreme emotional distress, and Newell approved sick leave. Newell informed Nadler that any employee on sick leave for more than three days must receive written approval to return to work. An employee could provide a release from a physician or from the occupational health office at Redstone. When Newell returned to work on March 3, 1999, he did not provide a release from any doctor or from the installation's occupational health office. Newell would not allow him to return to work until he got documentation

6

and placed him on annual leave without his permission, ensuring that Nadler did not lose pay. Nadler could not obtain a release from his own physician because his physician was unavailable. Nadler returned roughly a month later with permission from occupational health, and he was restored to duty.

All employees in Nadler's division had the option of choosing a compressed work schedule. A compressed work schedule allows employees to work eight nine-hour days and one eight-hour day rather than nine eight-hour days so that they may have one day off during every two-week work period. Employees may choose the hours they work each day as long as they are present at work during the core hours between 8:00 a.m. and 3:00 p.m. All employees must leave the building by 6:00 p.m. For example, an employee may choose to work 6:30 a.m. to 3:30 p.m. or 8:00 a.m. to 5:00 p.m. Newell authorized a modified compressed work schedule for Nadler in 1995 in response to documentation of Nadler's sleeping disorder. Newell allowed Nadler to depart from core hours and work from 8:15 a.m. to 6:00 p.m. with forty-five minutes for lunch on his nine-hour days and 9:15 a.m. to 6:00 p.m. on his eight-hour day.

Newell testified that Nadler continued to experience attendance problems and that he discussed these problems with Nadler on several occasions. On May 19, 1999, Newell placed Nadler on a fixed work schedule that required

7

Nadler to work Monday through Friday from 9:15 a.m. to 6:00 p.m. with forty-five minutes for lunch. Newell instituted the change because Nadler was not consistently reporting in a timely manner for nine-hour work days. The new schedule allowed Nadler to come in later to work and gave Nadler the option of informing the time-keeper when he was late and coordinating with her to make up the time. Newell was not allowed to work after 6:00 p.m. Newell testified that Nadler was still not arriving at work on time and failed to coordinate with the time-keeper. When Newell retired in 2002, the Army allowed Nadler to resume his modified compressed work schedule. Nadler currently works a compressed schedule with management allowances for a reasonable time to report.

In June of 2000, Newell noticed that Nadler had lifted his computer off of his desk and propped it up on the top of a partition in order to work standing. Newell, out of concern that the monitor would fall and injure another worker, instructed Nadler to move the computer back to his desk and to work sitting. Newell testified that he was unaware that Nadler was standing due to back pain. When Nadler presented medical documentation, Newell secured his computer and allowed him to work standing.

In June 2001 Newell charged Nadler with away-without-leave status for five days. This sanction arose out of a dispute regarding Nadler's time and attendance

during ten days in December 2000 and January 2001. Newell, while away on holiday leave, asked a fellow supervisor to keep track of Nadler's time. The supervisor documented that Newell did not meet the minimum attendance requirements for eight of the ten days. Newell requested an explanation and did not receive one. Nadler presented evidence that he had sent e-mail messages from his desk on three of the days, and Newell agreed to only charge him with away-without-leave status for five of the eight days.

## II.  Discussion

The Rehabilitation Act prohibits federal agencies from discriminating against any otherwise qualified individual with a disability solely by reason of his or her disability. 29 U.S.C. § 794(a). A plaintiff may prove discrimination in two ways, disparate treatment and a failure to make a reasonable accommodation. There has been considerable confusion throughout this case as to what type of discrimination Nadler has alleged.

Disparate treatment involves discriminatory animus or intent and occurs when a disabled individual is treated differently than a non-disabled or less disabled individual because of his disability. 42 U.S.C. § 12112(b).[2] By contrast,

---

[2]The Rehabilitation Act does not explicitly define discrimination, however, section 794(d) of the Act, added in 1992, adopts the definition of "discrimination" found within the Americans with Disabilities Act or ADA, 42 U.S.C. §12112(b).

a failure to make reasonable accommodation claim requires no animus and occurs when a covered entity fails to fulfill its affirmative duty to "make reasonable accommodation to the known physical or mental limitations of an otherwise qualified applicant or employee with a disability" without demonstrating that "the accommodation would impose an undue hardship on the operation of the business." 42 U.S.C. § 12111(b)(5)(A). Thus, while disparate treatment claims are concerned with policing employers' actions based on invidious discriminatory intent, "[t]he reasonable accommodation requirement is best understood as a means by which barriers to the equal employment opportunity of an individual with a disability are removed or alleviated." 29 C.F.R. § 1630, app. (2003). Determining the type of discrimination alleged by Nadler is not merely a matter of nomenclature; rather, it affects the evidentiary framework in which the Plaintiff must operate.

We allow plaintiffs to prove disparate treatment in disability cases "through circumstantial evidence using the familiar burden-shifting analysis employed in Title VII employment discrimination cases." *Wascura v. City of South Miami*, 257 F.3d 1238, 1242 (11th Cir. 2001). This burden-shifting analysis, often referred to as *McDonnell Douglas* burden-shifting, is a three-step process: (1) A plaintiff establishes a prima facie case of disparate treatment; (2) a defendant articulates a

10

legitimate, non-discriminatory reason for the challenged action; and (3) a plaintiff meets the ultimate burden of proof by proffering "sufficient evidence to create a genuine issue of material fact as to whether each of the defendant's proffered reasons is pretextual." *Id.* at 1243. It is considerably less clear that such burden-shifting applies in reasonable accommodation cases. We have not directly addressed this issue,[3] and we believe this case, which presents claims of both disparate treatment and reasonable accommodation, presents an appropriate opportunity to do so.

We will first address whether Nadler has met his prima facie case with respect to his back pain and insomnia/depression claims and then address whether the district court appropriately applied *McDonnell Douglas* burden-shifting. We review the district court's grant of summary judgment on Rehabilitation Act claims *de novo*. *Hilburn v. Murata Elec.*, 181 F.3d 1220, 1225 (11th Cir. 1999).

---

[3]We recognize that several of our reasonable accommodation cases contain language from which courts have implied that the burden-shifting analysis of Title VII is applicable. *See e.g., Hawkins v. Dale Med. Ctr.*, No. 1:05-CV-540-SRW, 2006 WL 1537228, *8 (M.D. Ala. May 31, 2006) ("In the Eleventh Circuit, the *McDonnell Douglas* burden-shifting framework applies to claims of failure to accommodate under the ADA."), citing *Boone v. Rumsfeld*, 172 Fed. Appx. 268, *1 (11th Cir. 2006) ("Discrimination claims brought under the Rehabilitation Act . . . are analyzed under the three-part test outlined in *McDonnell Douglas*."). *See also Holly v. Clairson Indust.,* No. 06-13365, 2007 U.S. App. LEXIS 17151, *23 (11th Cir. 2007), citing *Earl v. Mervyns*, 207 F.3d 1361, 1365 (11th Cir. 2000) ("The burden-shifting analysis of Title VII employment discrimination claims is applicable to ADA claims."). However, each of these cases was resolved on questions of disability or qualification, and the court was never required to reach the issue of discrimination or to apply or not apply burden shifting.

Summary judgment is only proper when the evidence, viewed in the light most favorable to the non-moving party, indicates that there are no genuine issues of material fact. *Id.*

## A. The Prima Facie Case for Disability Discrimination

To make out a claim under the Rehabilitation Act, a plaintiff must generally show (1) he was disabled at the time of the discrimination; (2) he was otherwise qualified; and (3) he was a victim of discrimination solely because of his disability. *Sutton v. Lader*, 185 F. 3d 1203, 1207 (11th Cir. 1999). If establishing discrimination by disparate treatment, a plaintiff must show (1) that he was subject to an adverse employment action, (2) that he was qualified for the job at the time, (3) that his employer knew at the time of the action that the plaintiff had a disability, and (4) that the adverse action took place in circumstances raising a reasonable inference that the plaintiff's disability was a determining factor in the decision. *Wascura*, 257 F.3d at 1242. If establishing discrimination by failure to make reasonable accommodation, a plaintiff must merely show that (1) he was disabled, (2) he was otherwise qualified, and (3) a reasonable accommodation was not provided. *Lucas v. W.W. Grainger, Inc.*, 257 F.3d 1249, 1255 (11th Cir. 2001).

In either instance, a plaintiff's first step is to show that he is disabled. A plaintiff has a disability within the meaning of the Rehabilitation Act if he can show (1) he is impaired; (2) his impairment limits a major life activity; and (3) the limitation is substantial. *Rossbach v. City of Miami*, 371 F.3d 1354, 1357 (11th Cir. 2004). Nadler presented evidence that he suffered from insomnia, depression, and back pain. There is no question that these conditions constituted an impairment.[4] At issue, is whether Plaintiff's impairments substantially limited a major life activity. We have considered Plaintiff's back pain claim for a reasonable accommodation, and we find it to have no merit. We affirm the district court's finding that Nadler's back pain did not rise to the level of a disability under the Rehabilitation Act. We will devote the remainder of this opinion to addressing the Plaintiff's claims of disparate treatment and failure to make a reasonable accommodation with respect to his insomnia and depression.

Nadler claims that he was substantially impaired by his insomnia and depression in the major life activity of sleeping. The first step in analyzing

---

[4]On appeal, the Army points to the fact that the sleep studies in the record were conducted during the mid-1990s and contends that Nadler did not provide evidence that he was disabled within the relevant time period 1998-2002 when the alleged discrimination took place. We note, however, that Nadler presented letters and testimony from his health care providers between 1999-2003 that indicate ongoing impairment. Further, there is nothing in the record to indicate that Nadler's condition changed between 1995, when the last sleep study was conducted, and 2002. In any event, as we determine that Nadler is not substantially impaired in sleeping even considering all the evidence, we need not determine whether any of the evidence was stale.

Plaintiff's claims is determining whether sleeping is a major life activity within the meaning of the Act. A major life activity is a basic activity that the average person in the general population can perform with little or no difficulty. 29 C.F.R. § 1630, app. Major life activities include "functions such as caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning and working." 45 C.F.R. § 84.3(j)(2)(ii).

While illustrative, this list is not exhaustive, and "the touchstone for determining an activity's inclusion under the statutory rubric is its significance." *Bragdon v. Abbott*, 524 U.S. 624, 638 (1998) (discussing reproduction as a significant activity that is no less important than walking or working). We find that sleep is a major life activity. *See Rossbach*, 371 F.3d at 1358 ("the district court sorted through the variety of activities . . . and properly focused on the major life activities of walking, sitting, standing, and sleeping"). Our opinion in *Rossbach* cited the Tenth Circuit's holding in *Pack v. Kmart Corp.*, 166 F.3d 1300, 1305 (10th Cir. 1999) (holding that sleep is a major activity), and characterized sleep as a major life activity without specifically so holding. Sleeping is a basic activity such as walking, seeing, hearing, or speaking that an average person can and does perform with little or no difficulty. The majority of our other sister circuits addressing this issue have also found sleep to be a major

life activity. *Burks v. Wisconsin Dep't of Transp.*, 464 F.3d 744, 755 (7th Cir. 2006); *Nuzum v. Ozark Auto. Distrib., Inc.,* 432 F.3d 839, 848 (8th Cir. 2005); *Head v. Glacier Northwest, Inc.*, 413 F.3d 1053, 1060 (9th Cir. 2005); *Swanson v. Univ. of Cincinnati*, 268 F.3d 307, 314 (6th Cir. 2001); *Colwell v. Suffolk Co. Police Dep't*, 158 F.3d 635, 643 (2d Cir. 1998). We adopt the holdings of our sister circuits and our characterization in *Rossbach* and formally hold that sleep constitutes a major life activity.

After a plaintiff identifies a relevant major life activity, he must present evidence on the way in which his impairments limit that activity and on how substantially his impairments limit that activity. An impairment substantially limits a major activity if it makes an individual completely unable to perform the activity or if it "significantly restricts the duration, manner or condition under which an individual can perform a particular major life activity as compared to the average person in the general population's ability to perform that same major life activity." 29 C.F.R. § 1630, app.; *Toyota Motor Mfg., Kentucky, Inc. v. Williams*, 534 U.S. 184, 196 (2002) (The court should consider "the nature and severity of the impairment; the duration or expected duration of the impairment; and the permanent or long-term impact, or the expected permanent or long-term impact of or resulting from the impairment").

15

We have applied these guidelines to the major life activity of sleeping and have stated, "Difficulty sleeping is extremely widespread," and a plaintiff must present evidence, beyond vague assertions of "a rough night's sleep" or a need for medication, "that his affliction is [] worse than [that] suffered by large portion of the nation's adult population." *Rossbach*, 371 F.3d at 1358 (citing *Colwell*, 188 F.3d at 644). "[S]omeone who . . . sleeps 'moderately below average' is not disabled under the Act." *Id.* Our sister circuits have also applied these guidelines to insomnia and have found plaintiffs sleeping as little as two and a half hours at a time and as little as four and a half hours a night not to be substantially impaired. *See Burks*, 464 F.3d at 755 (difficulty sleeping for more than three hours is not substantial when plaintiff presented no medical records or other evidence to demonstrate the effect of this situation on her ability to function in daily life), *Nuzum*, 432 F.3d at 848 (two and a half hours at a time and five hours a night is not substantially impaired); *Swanson*, 268 F.3d at 314 (holding that while less than five hours sleep is not optimal, it is generally not significantly restricted in comparison to the average person in the general population); *but see Head*, 413 F.3d at 1060 (holding five to six hours of sleep are enough to raise a genuine issue

16

of material fact when the plaintiff testified that he was drowsy at work due to medication and a lack of sleep) .[5]

Here, Nadler asserts that his depression and insomnia limited his ability to sleep because he slept fewer hours than he felt he needed and the sleep he got was fragmented. The record indicates that Nadler was getting between four and seven and a half hours of sleep a night, with an average of five and a half to six and a half hours and that his sleep quality was between fifty and eighty percent.[6] This evidence established that Nadler's sleep was limited by his insomnia and depression, but it did not establish that Nadler was substantially limited. With medication, Nadler was getting significantly more sleep than the plaintiffs in *Swanson* and *Newman*. Nadler presented no evidence that getting less than a full night of sleep affected him differently than others. While five and a half to six and a half hours of sleep per night "is not ideal," it is likely no more than "moderately

---

[5]If a plaintiff is able to mitigate his sleeping disorder by taking medication, a court must consider the effect of the medication when determining the plaintiff's sleep patterns. *Sutton v. United Air Lines*, 527 U.S. 471, 482 (1999) ("[I]f a person is taking measures to correct for, or mitigate, a physical or mental impairment, the effects of those measures – both positive and negative – must be taken into account when judging whether that person is 'substantially limited' in a major life activity and thus 'disabled' under the Act.").

[6]Appellant contends that this data does not accurately reflect his sleep because he was medicated during these studies. However, as we have explained, under the Supreme Court's ruling in *Sutton*, a court can and should consider the mitigating effects of medication when determining substantial impairment.

below average."  Thus, the district court correctly found that Nadler had not presented sufficient evidence that his insomnia and depression substantially limited his major life activity of sleeping.[7]

Even if Nadler was "disabled" within the meaning of the Act, he would not necessarily be entitled to relief.  We will address Nadler's three allegations of discrimination separately.

First, Nadler alleges that Newell refused to accommodate his sleep disorder with a modified compressed work schedule that allowed a flexible start time.  In order to succeed on this claim, Nadler would have to prove that he was otherwise qualified and that a reasonable accommodation was not provided.  A plaintiff is "otherwise qualified" if he, with or without any reasonable accommodation, can

---

[7]Appellant directs the court to the testimony of Dr. John Sandy who responded affirmatively in deposition to questions of whether Nadler's condition "substantially limited his sleep activity compared to the normal population" and whether he considered Plaintiff to be suffering "a severe sleep disorder."  Following the Supreme Court's guidance in *Williams,* however, we focus not merely on the medical diagnosis of the plaintiff's physicians, but rather on the effect the diagnosed impairment has on the life and abilities of the plaintiff and the plaintiff's own testimony concerning his abilities.  534 U.S. at 691 (It "is insufficient for individuals attempting to prove disability status under this test to merely submit evidence of a medical diagnosis of an impairment.  Instead, the ADA requires those claiming the Act's protection . . . to prove a disability by offering evidence that the extent of the limitation [caused by their impairment] in terms of their own experience . . . is substantial."); *see also* 29 C.F.R. pt. 1630 background (explaining that the determination of whether an individual has a disability "must be made on a case-by-case basis" and "is not necessary based on the name or diagnosis of the impairment the person has, but rather on the effect of that impairment on the life of the individual").

perform the essential functions of the job. 42 U.S.C. § 12111(8); *Earl*, 207 F.3d at 1365. This is a two-step inquiry which requires the court to determine first, whether the plaintiff can perform the essential functions of the job and second, whether there is any reasonable accommodation that would allow him to do so. *Lucas*, 257 F.3d at 1255. Under the ADA, "part time or modified work schedule[s]" may be reasonable accommodations. 42 U.S.C. § 12111(9)(B). A plaintiff bears the burden of identifying his accommodation, and of demonstrating that the accommodation allows him to perform the essential functions of the job. *Stewart v. Happy Herman's Cheshire Bridge, Inc.*, 117 F.3d 1278, 1286 (11th Cir. 1997).

Here, the district court correctly determined, and the parties did not dispute on appeal, that attendance and punctuality are essential functions of the job and that Nadler could not arrive on time without an accommodation. The parties disagreed as to whether Nadler had shown that there was a reasonable accommodation that would allow him to arrive on time. Nadler demanded a modified compressed work schedule with a flexible reporting time, however, he offered no concrete evidence that he could arrive on time or had arrived on time while on a modified compressed work schedule. The only evidence offered by Plaintiff was the fact that he had been allowed to work on this schedule for a

19

number of years before Defendant terminated it and that he was currently working on this schedule. We find this evidence to be insufficient. Defendant's past tolerance of Plaintiff's tardiness is not evidence that Plaintiff could arrive on time. We hold that Nadler has not met his burden of proving he was "otherwise qualified."

Further, Nadler has not shown that a reasonable accommodation was not provided. Defendant offered Plaintiff a five-day-a-week schedule with a later reporting time and an option to come in late as needed as long as the time-keeper was notified and the time was made up. This allowed Plaintiff to arrive at work outside of core hours and an hour later than his reporting time under a modified compressed schedule and gave him the flexibility to be later if necessary. Plaintiff argues that this is not sufficient, yet he offered no evidence on how a modified compressed work schedule would more appropriately accommodate his disability. The only evidence he offered was to say that the compressed schedule would allow him to take Fridays off to take care of personal matters and that he would otherwise have to utilize leave time for these matters. We do not see the connection between this benefit and Plaintiff's insomnia. Plaintiff's counsel virtually admitted as much during oral argument when he explained that Plaintiff could arrive at work as early as 7:00 a.m. if he was allowed every second Friday

20

off, whereas he could only arrive at 9:00 a.m. if required to work five days a week. Under the Rehabilitation Act "a qualified individual with a disability is not entitled to the accommodation of [his] choice, but only to a reasonable accommodation." *Stewart*, 117 F.3d at 1285. We find Defendant's accommodation was reasonable.

Plaintiff further argues that Defendant engaged in disparate treatment when he (1) refused to allow Plaintiff to return to work in 1999 without a medical release and (2) charged Nadler with away-without-leave status in the winter of 2000 and 2001. In order to succeed on this argument, Nadler must prove that Newell's acts took place in circumstances raising a reasonable inference that his disability was a determining factor in the decision. "It is not enough for a plaintiff to demonstrate that an adverse employment action was based partly on his disability." *Ellis v. England*, 432 F.3d 1321, 1326 (11th Cir. 2005). "Rather, under the Rehabilitation Act, a plaintiff must prove that he suffered an adverse employment action 'solely by reason of' his handicap." *Id.* (citing 29 U.S.C. § 794(a)). We adopt the reasoning of the district court and hold that Nadler met this burden with respect to the former occurrence but not the latter. Further, we agree with the district court that Defendant presented valid non-discriminatory reasons for its actions and that Plaintiff did not prove pretext.

## B.    McDonnell Douglas Burden-Shifting

After assuming that Plaintiff could make out his prima facie case for disability, the district court applied *McDonnell Douglas* burden-shifting to all three of the Plaintiff's insomnia claims and held that Plaintiff had failed to establish pretext.  We hold that this analysis was improper as applied to Plaintiff's claim that Defendant failed to accommodate his insomnia with a modified compressed work schedule.

The purpose of *McDonnell Douglas* burden-shifting is to "sharpen[] the inquiry into the elusive factual question of intentional discrimination."  *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 506 (1993) (quoting *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 255 n.8 (1981)); *accord Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 141 (2000) (stating that "[w]hen a plaintiff alleges disparate treatment, 'liability depends on whether the protected trait . . . actually motivated the employer's decision'"; thus, *McDonnell Douglas* is utilized to alleviate the burden of dealing with this "sensitive and difficult" question that is seldom subject to direct evidence).  Such elusive questions are almost always present in the sex and race cases from which *McDonnell Douglas* arose, as an employer is unlikely to admit that he impermissibly took an employee's race or sex into account.  Disability disparate treatment cases, in which an employer

22

claims that he took an adverse action for reasons unrelated to the employee's handicap, also involve the sort of inquiry into subjective facts of motivation that *McDonnell Douglas* was designed to address, but these facts are not present in accommodation cases. An employer *must* reasonably accommodate an otherwise qualified employee with a *known* disability unless the accommodation would impose an undue hardship in the operation of the business. *See* 42 U.S.C. §12111(b)(5)(A) (discussing undue hardship as an affirmative defense). Thus, applying *McDonnell Douglas* to reasonable accommodation cases would be superfluous, since there is no need to prove discriminatory motivation.

A majority of our sister circuits have been persuaded by this distinction, and we join with them today and hold that *McDonnell Douglas* burden-shifting is not applicable to reasonable accommodation cases. *Pebbles v. Potter*, 354 F.3d 761, 765 (8th Cir. 2004); *Lenker v. Methodist Hosp.*, 210 F.3d 792, 799 (7th Cir. 2002) ("[W]hen a plaintiff brings a claim under the reasonable accommodation part of the ADA, the burden shifting method of proof is both unnecessary and inappropriate"); *Higgins v. New Balance Athletic Shoes, Inc.*, 194 F.3d 252, 264 (1st Cir. 1999) (arguing that reasonable accommodation does not require an employer's action be motivated by discriminatory animus directed at disability, and thus "[i]t follows inexorably that the *McDonnell Douglas* scheme is inapposite

23

in respect to such claims."); *Aka v. Washington Hosp. Center*, 156 F.3d 1284, 1288 (D.C. Cir. 1998) (en banc) (adopting the analysis of *Barth v. Gelb*, 2 F. 3d 1180, 1186 (D.C. Cir. 1993)); *William v. Channel Master Satellite Sys., Inc.*, 101 F.3d 346, 348 n.1 (4th Cir. 1996) ("The *McDonnell Douglas* test is designed to circumvent a factual dispute over the reasons for discharge, and is therefore most appropriate when the defendant disavows any reliance on discriminatory reasons for its adverse employment action.").  Once a plaintiff has shown that he is an otherwise qualified disabled individual within the meaning of the Act and that a defendant has not provided a reasonable accommodation, a defendant must provide a reasonable accommodation unless he can assert an undue hardship as an affirmative defense.  Undue hardship is an affirmative defense to be pled by an ADA defendant.  *Willis v. Conopco, Inc.*, 108 F.3d 282, 286 (11th Cir. 1997).

Here, Nadler has not presented evidence that he is disabled or otherwise qualified within the meaning of the Act, and in any event, we find Defendant's offered accommodation to be reasonable.  Therefore, both Nadler's disparate treatment and reasonable accommodation claims fail.

## III.  Conclusion

For the foregoing reasons, the judgment of the district court is AFFIRMED.