In the

# United States Court of Appeals

## For the Seventh Circuit

No. 15-1915

CARMEN CAROTHERS,

*Plaintiff-Appellant,*

*v.*

COUNTY OF COOK, *et al.,*

*Defendants-Appellees.*

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 12 C 6620 — **Joan Humphrey Lefkow**, *Judge.*

ARGUED NOVEMBER 12, 2015 — DECIDED DECEMBER 21, 2015

Before BAUER, FLAUM, and MANION, *Circuit Judges.*

BAUER, *Circuit Judge.* Plaintiff-appellant, Carmen Carothers ("Carothers"), filed a second amended complaint against the Office of Transitional Administrator, Earl Dunlap, and the County of Cook (collectively, the "Defendants"). Carothers alleged disability discrimination in violation of the Americans with Disabilities Act, 42 U.S.C. § 12101 *et seq.* ("ADA"), as well as race discrimination, sex discrimination, and retaliation in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C.

§ 2000e *et seq.* ("Title VII"). The district court granted the Defendants' motion for summary judgment, and Carothers appealed. For the reasons that follow, we affirm the district court's opinion.

## I. BACKGROUND

The Office of the Transitional Administrator is a federal agency that oversees the operation of the Cook County Juvenile Detention Center (the "JDC"). Earl Dunlap is the Transitional Administrator in charge of transferring administration of the JDC from the federal government to Cook County. Carothers, an African-American woman, was hired by the JDC in August 2005. Carothers served as an Administrative Assistant 1/Hearing Officer. The position involves compiling statistics, inputting data and creating reports, as well as serving as a hearing officer to adjudicate juvenile detainee grievances.

On or about June 22, 2009, Carothers was involved in a physical altercation with a juvenile detainee during a riot at the JDC, in which Carothers injured her hands and went on a leave of absence. While on leave, Carothers applied for worker's compensation and eventually entered into a settlement with Cook County.

On July 16, 2009, Diana Anderson ("Anderson"), the Director of Human Resources at the JDC, sent Carothers a letter acknowledging the injury to her hands and that the JDC was "able to make reasonable accommodations to your job duties that will not require the use of your injured hand." The letter also reminded Carothers that pursuant to the JDC's policy, she could not return to work until she had scheduled an

appointment with the Cook County Department of Resources' Medical Division ("Medical") and received clearance to return to work.

On December 2, 2009, Anderson sent Carothers a letter acknowledging that Medical released Carothers to return to work with restrictions. The letter noted that Carothers' doctor had restricted her from interacting with the juvenile detainees, which her job as an Administrative Assistant 1/ Hearing Officer required. The letter further suggested that Carothers review available positions at the JDC posted on www.careerbuilder.com ("CareerBuilder") and to contact Anderson if Carothers believed she was qualified for any position.

On December 10, 2009, Carothers faxed Anderson a letter stating that she could not find a position on CareerBuilder that accommodated her restriction. On January 12, 2010, Anderson sent Carothers a letter stating that since there were no available positions that accommodated Carothers' restrictions, "[the JDC] ask[s] that you contact the Pension Board … to apply for Disability Benefits." Rather than contact the Pension Board, Carothers proceeded to send five letters to Anderson from January 22, 2010, through February 25, 2010, all of which inquired whether there were any open positions that accommodated her disability.

On March 15, 2010, William Kern ("Kern"), Deputy Executive Director of the JDC, received a memorandum from Deputy Transitional Administrator Brenda Welch informing him that Carothers was returning to work and that he would be her supervisor. On March 16, 2010, Carothers returned to

the JDC as an Administrative Assistant 1/Hearing Officer.
Upon her return, Carothers received a written job description
for the Administrative Assistant 1/Hearing Officer position.
The job description included conducting due process hearings
for juvenile detainees, as well as handling juvenile detainee
grievances. Carothers signed the job description, but wrote: "[I]
was not a[] hearing officer when I [first] received [the posi-
tion]." But Carothers does not dispute that between March
2007 and October 2007, Carothers completed over 188 disci-
plinary due process hearings for juvenile detainees.

After her return, Carothers worked primarily with data
entry. In October 2010, Kern informed Carothers that she had
to take Physical Restraint Techniques ("PRT") training and De-
escalation training on October 28 and 29, 2010, to assist with
her position as a hearing officer. Later that day, Carothers
requested both of those days off due to previously scheduled
doctors' appointments. Kern denied this request, so Carothers
submitted it to a different Deputy Executive Director, who
approved. As a result, Kern informed Carothers that she had
to take De-escalation training on December 22, 2010, and PRT
training on December 27, 2010. Kern also directed Carothers to
observe three hearing officers conduct hearings at the JDC by
December 31, 2010.

On December 22, 2010, Carothers gave Kern a letter dated
December 13, 2010, that was written by James M. Campbell,
who disclosed that he had been counseling Carothers since
January 2010. The letter stated: "[d]ue to a recent traumatic
incident that resulted in a high degree of anxiety, I feel that it
would be advisable to have [Carothers] avoid working with
children at this time." Kern forwarded the letter to Anderson,

who then informed Carothers that her request to avoid working with children was denied. Anderson directed Carothers to continue performing the job functions of an Administrative Assistant 1/Hearing Officer, which included adjudicating due process hearings for juvenile detainees.

Carothers completed the PRT training on December 22, 2010. On December 29, 2010, Kern learned that Carothers had failed to attend the De-escalation training that occurred earlier that day.[1] Kern confronted Carothers about this, but she explained that she did not attend because she did not know where the training was located. Kern did not believe her, since the De-escalation training occurred in the same room as the PRT training, there was only one room at the JDC where training was conducted, and the room was about 15 feet from Carothers' office. Shortly thereafter, Kern recommended to the Government and Labor Relations Unit that Carothers be disciplined.

On December 29, 2010, after Kern confronted Carothers about missing De-escalation training, Carothers began to shadow other hearing officers at the JDC in accordance with Kern's directive. During the shadowing, however, Carothers became nauseous and fainted. She was taken by ambulance to a hospital, but was released that same day.

On January 3, 2011, Anderson sent Carothers a letter stating that because she left in an ambulance she could not return to

---

[1]   The record is unclear why there is a discrepancy regarding which dates the PRT and De-escalation training were originally scheduled for and when they actually occurred.

work until the JDC received paperwork from Carothers' doctor clearing her to return to work. The following day, Anderson sent a letter to Carothers indicating that she received the paperwork from Carothers' doctor, but it indicated that Carothers should avoid working with children. Because Carothers' position involved daily interaction with juvenile detainees, Anderson requested that Carothers undergo a "fit for duty" examination, and informed her that she needed to report to Medical in order to be released to "full duty."

On January 7, 2011, a physician at Medical evaluated Carothers and found that she could return to work, but should have "no contact with residents." On January 12, 2011, Anderson sent Carothers a letter stating that since one of the "primary responsibilities" of an Administrative Assistant 1/ Hearing Officer was interacting with juvenile detainees, she was going to refer Carothers to the Pension Board to apply for disability. Anderson also spoke with Carothers and informed her that she could not return to her original position due to her restriction regarding working with the juvenile detainees, and advised her to research and apply for another job at the JDC.

On February 8, 2011, Anderson sent Carothers a letter informing her that she was out on an unexcused leave and she had to either return to work or apply for permanent disability. The letter also stated that although Carothers had submitted her application for disability, she had not yet provided all of the required documentation. Anderson gave Carothers until February 18, 2011, to submit her completed disability paper-work, or until February 16, 2011, to schedule an appointment with Medical to receive clearance to return to work.

On February 14, 2011, Carothers sent Anderson a fax stating that the "disability paperwork has already been submitted." However, that same day the Disability Benefit Department sent a letter to Carothers informing her that her application was incomplete. The letter stated that to be eligible for review, Carothers had to submit an "Attending Physician Statement" and a "County Physician Statement – or – Certification of Disability Status" by May 9, 2011. Despite this letter, as well as later conversations with Anderson, Carothers insisted that she had submitted her application and refused to submit the two requested documents.

On April 8, 2011, Anderson sent Carothers a letter informing her that she still had not completed her disability application. The letter further stated that Carothers must either complete her paperwork for disability or return to work. Carothers' disability documents were due by April 15, 2011, but if she chose to return to work then she had to schedule an appointment with Medical by April 12, 2011. The letter concluded: "Your unresponsiveness will be viewed as job abandonment and will be referred for a pre-disciplinary meeting."

On April 18, 2011, Anderson submitted a "Disciplinary Recommendation" to the Government and Labor Relations Unit regarding Carothers. Anderson noted that Carothers "refuses to file for disability and cannot obtain a release to return to work full duty. She has failed to follow a directive." On May 4, 2011, a pre-disciplinary hearing was held at the JDC in front of a Hearing Officer from the Office of the Transitional Administrator. Carothers was represented by counsel at the hearing. On May 5, 2011, the Hearing Officer

recommended discharging Carothers due to her accumulating over ten unauthorized absences, as well as her failure to follow Anderson's instructions from the April 8, 2011, letter. The JDC discharged Carothers in May 2011.

Carothers filed suit against the Defendants in August 2012, and filed her second amended complaint in January 2013, which alleged that after Carothers' June 2009 altercation with the juvenile detainee, she developed an anxiety disorder and that the JDC's discharge constituted discrimination on account of her disability. She further claimed that the JDC's discharge constituted discrimination on account of her race and sex. Finally, she argued that the JDC retaliated against her for filing a claim with the Equal Employment Opportunity Commission ("EEOC") in July 2009 alleging racial and gender discrimination. On March 30, 2015, the district court granted summary judgment in favor of the Defendants. This appeal followed.

## II. DISCUSSION

We review the district court's grant of summary judgment *de novo*, and examine the entire record in the light most favorable to Carothers. *Stern v. St. Anthony's Health Ctr.*, 788 F.3d 276, 284–85 (7th Cir. 2015) (citation omitted). Summary judgment is appropriate if there are no genuine disputes of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). We address each of Carothers' claims separately to determine whether the district court correctly granted summary judgment.

### A.  ADA Disability Discrimination Claim

To establish discrimination on the basis of a disability, Carothers must show: (1) she is "disabled" within the meaning of the ADA; (2) she is "qualified to perform the essential functions" of the position (with or without a reasonable accommodation); and (3) she "suffered from an adverse employment action because of her disability." *Hoppe v. Lewis Univ.*, 692 F.3d 833, 838–39 (7th Cir. 2012) (citation omitted). In this case, Carothers failed to establish that she is "disabled" for ADA purposes.

Under the ADA, the term "disability" means that an individual has: (1) a physical or mental impairment that substantially limits one or more "major life activities"; (2) a record of such impairment; or (3) being regarded as having such an impairment. 42 U.S.C. § 12102(1). Further, the ADA defines "major life activities" as including, but not limited to: "caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, and working." 42 U.S.C. § 12102(2)(A).

Carothers argues that she has a mental impairment (an anxiety disorder that is "exacerbated by exposure to and interactions with teenagers"), that substantially limits her major life activity of working. But, if "working" is the only major life activity Carothers claims is impaired, then she has to show that her anxiety disorder "significantly restricted [her] ability to perform either a class of jobs or a broad range of jobs in various classes as compared to the average person having comparable training, skills and abilities." *Povey v. City of*

*Jeffersonville, Ind.*, 697 F.3d 619, 623 (7th Cir. 2012) (citation omitted); *see also* 29 C.F.R. § 1630 Appendix. Furthermore, "[d]emonstrating a substantial limitation in performing the *unique aspects of a single specific job* is not sufficient to establish that a person is substantially limited in the major life activity of working." 29 C.F.R. § 1630 Appendix (emphasis added).

Here, Carothers has presented evidence that her anxiety disorder prevents her from interacting with juvenile detainees at the JDC. However, interacting with juvenile detainees is a *unique aspect* of the *single specific job* of working as a hearing officer at a juvenile correctional center. There is no evidence that Carothers' anxiety disorder would prevent her from engaging in any other line of occupation. Since the inability to interact with juvenile detainees does not restrict Carothers from performing either a class of jobs or a broad range of jobs, she has not established that she is disabled within the meaning of the ADA. *See Powers v. USF Holland, Inc.*, 667 F.3d 815, 822–23 (7th Cir. 2011) (holding that plaintiff was not impaired in the major life activity of working when the evidence only indicated that he could not work in truck driving positions involving substantial dock work, as opposed to all truck driving positions in general).

Carothers argues for the first time on appeal that her anxiety disorder not only prevented her from interacting with the juvenile detainees at the JDC, but also prevented her from interacting with *any* children. She argues that since "contact with children could occur with any job in which [Carothers] would have access to the public," her anxiety disorder does prevent her from performing a broad range of jobs. Her only support for this claim is a single line from James M. Campbell's

letter that states, "I feel that it would be advisable to have [Carothers] avoid working with children at this time."

Carothers did not present this argument to the district court; thus it is waived. *See Fleishman v. Cont'l Cas. Co.*, 698 F.3d 598, 607 (7th Cir. 2012) (finding plaintiff could not argue his impairment limited his ability to "work" when he only argued it affected his ability to "function and live" in the district court). Furthermore, the record does not indicate that Carothers' anxiety disorder impaired her interactions with *all* children. Even by construing the medical evaluations, doctors' letters, and the fainting incident in the light most favorable to Carothers, her anxiety disorder was specifically limited to impairing her interactions with juvenile detainees.

In addition, Carothers' claim that she could not perform any job that had "access to the public" appears disingenuous when she admitted in her deposition that she was working part-time at Lady Foot Locker while she was on leave following the June 2009 incident. Therefore, we cannot reasonably infer that her anxiety disorder prevented her from interacting with any children whatsoever. *See Cung Hnin v. TOA (USA), LLC*, 751 F.3d 499, 508–09 (7th Cir. 2014).

Since Carothers failed to show that she was disabled under the meaning of the ADA, summary judgment was appropriate.[2]

---

[2]   Carothers also brought an ADA claim for failure to accommodate. However, this claim fails because establishing that Carothers is "disabled" is also required for a failure to accommodate claim. *See King v. City of Madison*, 550 F.3d 598, 600 (7th Cir. 2008) (to withstand summary judgment

(continued...)

**B. Title VII Race Discrimination Claim**

A plaintiff may establish a claim for race discrimination in violation of Title VII by utilizing the direct method of proof or the indirect method of proof. *Harris v. Warrick Cnty. Sheriff's Dep't*, 666 F.3d 444, 447 (7th Cir. 2012) (citation omitted). In this case, Carothers proceeded under both the direct and indirect methods of proof. Her claim fails under either.

**1. Direct Method**

To proceed under the direct method of proof, Carothers must present either direct or circumstantial evidence that "creates a convincing mosaic of discrimination on the basis of race." *Id.* (citation omitted). Here, Carothers presents three pieces of circumstantial evidence she claims creates a convincing mosaic of discrimination. First, she states that Earl Dunlap told a group of employees, which included Carothers and other African-Americans, that he would "take them to the woodshed." Carothers interpreted this phrase as having racist undertones, since she believed it referred to how slaves were punished in the antebellum South. Second, she claims that Earl Dunlap once made a comment in 2008 within Carothers' presence that Malcolm X was right that "black people should have their own stuff." Finally, she states that she is aware that Brenda Welch was sued for race discrimination in her previous employment.

---

[2] (...continued)

on failure to accommodate claim, must show: (1) plaintiff is qualified individual *with a disability*; (2) employer was aware of the disability; and (3) employer failed to reasonably accommodate the disability) (emphasis added) (citation omitted).

To defeat summary judgment under the direct evidence theory by relying solely upon circumstantial evidence, Carothers must show that the evidence "points directly to a discriminatory reason for the employer's action." *See Good v. Univ. of Chi. Med. Ctr.*, 673 F.3d 670, 675 (7th Cir. 2012) (citations and quotation omitted). First, regarding the woodshed comment, we agree with the district court that the idiom "take someone to the woodshed" refers to punishing or reprimanding an individual, and there is no indication that the phrase has any racial undertones. In fact, according to the Oxford Dictionary of English Idioms, the etymology of the phrase does not involve slavery, but rather refers "to the former practice of taking a naughty child to a woodshed to be punished, out of sight of other people." From the horse's mouth: Oxford Dictionary of English Idioms 387 (John Ayto ed., 3rd ed. 2009). Second, Earl Dunlap's Malcolm X comment was made sometime in 2008, yet the action at issue in this case is Carothers' discharge in May 2011. Therefore, no reasonable jury could find that either remark *directly* points to a discriminatory reason for Carothers' discharge.

Finally, although Carothers claims that Brenda Welch was previously sued for race discrimination, she offers no evidence that Brenda Welch had anything to do with the JDC's decision to terminate Carothers' employment. While Carothers argues that Ms. Welch had previously complained to Earl Dunlap about Carothers prior to her termination, she does not cite anything in the record to support this contention other than her own assertion. Nor does she indicate when this alleged complaint occurred, what its contents were, or how it affected Carothers' termination. Furthermore, there is no evidence that

Ms. Welch had any role in determining Carothers' employment status at the JDC. Thus, even assuming that Ms. Welch held racial animus against African-Americans, Carothers cannot succeed under the direct method of proof without showing any connection between this animus and Carothers' May 2011 discharge. *See Harper v. Fulton Cnty., Ill.*, 748 F.3d 761, 766 (7th Cir. 2014) ("[B]igotry, *per se*, is not actionable. It is actionable only if it results in injury to a plaintiff; there must be a real link between the bigotry and an adverse employment action.") (citation and quotation omitted).

### 2. Indirect Method

To proceed under the indirect method of proof, Carothers must present evidence that: "(1) she is a member of a protected class, (2) her job performance was meeting her employer's legitimate expectations, (3) she was subject to a materially adverse employment action, and (4) the employer treated similarly situated employees outside the protected class more favorably." *Winsley v. Cook Cnty.*, 563 F.3d 598, 604 (7th Cir. 2009) (citations omitted). It is undisputed that Carothers was a member of a protected class and that she suffered an adverse employment action. However, she was not meeting legitimate employment expectations and there is no evidence that the JDC treated similarly-situated employees outside of the protected class more favorably.

Whether Carothers met the JDC's legitimate employment expectations is analyzed by examining her performance "*at the time* of the employment action." *Moser v. Ind. Dep't of Corr.*, 406 F.3d 895, 901 (7th Cir. 2005) (emphasis in original). While Carothers fails to address this issue, the Defendants argue that

at the time of her discharge she had excessive absenteeism and was insubordinate. In the two months preceding her discharge, she refused to follow Anderson's instructions regarding submitting the required paperwork for her disability application, and she did not schedule an appointment with Medical to return to work. In addition, although Carothers claims she did submit all of the required paperwork, the Pension Board stated that it did not have it, and Carothers ignored Anderson's reasonable requests to submit (or re-submit) the missing documentation. Further, at the time of her discharge she had exceeded the allowed number of unexcused absences by more than ten days. Thus, Carothers did not satisfy the legitimate expectations of her employer. *See Bass v. Joliet Pub. Sch. Dist. No. 86*, 746 F.3d 835, 841 (7th Cir. 2014) (finding that plaintiff was not meeting her employer's legitimate employment expectations because she repeatedly violated the attendance guidelines).

In addition, Carothers fails to show that similarly-situated co-workers outside the protected class were treated more favorably. Under the similarly-situated analysis, this court examines "whether there are *sufficient commonalities on the key variables* between the plaintiff and the would-be comparator to allow the type of comparison that … would allow a jury to reach an inference of discrimination or retaliation." *South v. Ill. Envtl. Prot. Agency*, 495 F.3d 747, 752 (7th Cir. 2007) (emphasis in original) (citation omitted). Generally this involves examining whether the two employees shared the same supervisor, were subject to the same standards and had engaged in similar conduct, without significant distinguishing factors justifying the differential treatment. *Id.* (citation omitted). However, it is

a flexible analysis and above all, "common sense must guide this inquiry." *Id.* (citation omitted).

Carothers first argues that John Albright, a Caucasian male employee, was also injured in the June 2009 riot, but that the JDC created a position in training for him that had no access to the juvenile detainees and included a pay raise. However, the Defendants indicate that Mr. Albright was originally hired as a Youth Development Specialist, and in March 2011 was hired as a Professional Development Specialist because of his experience with cognitive behavior therapy. He worked in that position until June 2013, when he was appointed to Director of Quality Insurance. Importantly, Defendants assert that all three positions involve interacting with the JDC detainees.

Carothers admits she has no knowledge of Mr. Albright's job title, nor of his qualifications. Since Carothers' only evidence that Mr. Albright's position involves no interaction with juvenile detainees is her own uncorroborated statement, and she does not know what Mr. Albright's job title is, we cannot reasonably infer that the positions do not involve interactions with the juvenile detainees. *See Cung Hnin, LLC*, 751 F.3d at 508–09. The only variable that Mr. Albright and Carothers share is that they both were injured in the June 2009 riot. However, Mr. Albright is not a sufficiently similar co-worker because he did not work in the same position as Carothers and had different training than her. *See Diaz v. Kraft Foods Global, Inc.*, 653 F.3d 582, 590 (7th Cir. 2011).

Carothers additionally argues that Donnie Mobile,[3] a Caucasian male, had been terminated for "no call no show," but that the JDC had rehired him. The record indicates that Mr. Mobile was the Supervisor of Quality Assurance until he became ill in November 2011 and went on an approved leave of absence. Once his health improved in January 2012, he was rehired. Notably, Carothers admits that she has no knowledge of Mr. Mobile's health. Although both Mr. Mobile and Carothers took extended leaves of absence, Mr. Mobile did not violate the JDC's attendance policy. Carothers' more than ten unexcused absences at the time of her discharge is a significant distinguishing factor that justifies her differential treatment. *See Majors v. Gen. Elec. Co.*, 714 F.3d 527, 538–39 (7th Cir. 2013) (finding that the plaintiff could not survive summary judgment when she failed to show how alleged comparators were similarly situated other than that they had the same job title).

Carothers also claims that in October 2009 she applied for the litigation analyst position, but Kern informed her she would not get it. Carothers states that the position instead went to a "Caucasian woman that Kern had worked with at the March of Dimes." However, Carothers provides no information to support this other than her own statement at her deposition. Instead, the record contradicts her assertion because Kern was not her supervisor until March 2010. Further, the documentation from CareerBuilder indicates that Carothers only applied for two positions between October 2008 and July 2011, neither of which was a litigation analyst

---

[3] The record is unclear whether his last name is spelled "Mobile" or "Mobley."

position. In fact, the CareerBuilder documents show that Carothers did not apply for a position in October 2009. As a result, Carothers' uncorroborated claim regarding the Caucasian woman from the March of Dimes cannot defeat the Defendants' motion for summary judgment. *See Ford v. Minteq Shapes and Servs., Inc.*, 587 F.3d 845, 848 (7th Cir. 2009) ("The record's only evidence of [defendant] paying more to white employees with equal responsibilities is [plaintiff's] own conclusory, uncorroborated testimony. This is not enough to survive summary judgment.").

We agree with the district court that Carothers has not established sufficient evidence under either the direct or indirect methods of proof. As a result, summary judgment on the Title VII race discrimination claim was appropriate.

### C.  Title VII Sex Discrimination Claim

Carothers argues that her discharge also constituted unlawful sex discrimination. She proceeds under the indirect method of proof, which involves the same four elements as stated above. *See, e.g., Bass*, 746 F.3d at 841 (listing the elements).

First, we have already found that Carothers was not meeting legitimate employment expectations at the time of her discharge. Second, Carothers only supports her claim by noting that Kenny Davis and Vester Young were both African-American male employees at the JDC who were injured at work and were assigned to positions that involved no contact with juvenile detainees. But, Carothers fails to address the fact that Mr. Davis and Mr. Young were both assigned to the "Support Clerk" position. Although this position does not

involve contact with juvenile detainees, it is reserved solely for employees who have a substantiated claim against them for abusing juvenile detainees, but are ordered by a court to return to work. Earl Dunlap created the Support Clerk position to ensure that employees who have been charged with abusing the juvenile detainees cannot have any further contact with them. Mr. Davis and Mr. Young both had charges of abuse filed against them. Carothers did not.

Because Carothers failed to show that she was similarly-situated to either Mr. Davis or Mr. Young, summary judgment was appropriate.

### D. Title VII Retaliation Claims

Retaliation claims proceed like discrimination claims under either the direct or indirect methods of proof[4]. *See Johnson v. Gen. Bd. of Pension & Health Benefits of United Methodist Church*, 733 F.3d 722, 727 (7th Cir. 2013) (citation omitted). In this case, however, Carothers fails to identify whether she has a viable retaliation claim under either the direct or indirect methods of proof. Rather, she simply states that she was retaliated against for filing a worker's compensation claim after her June 2009 injury, and for filing a discrimination complaint with the Illinois Department of Human Rights and the EEOC on

---

[4]   Recent circuit opinions have critiqued the utility of distinguishing between the direct and indirect methods of proof, however we have yet to abandon these two forms of analysis. *See Castro v. DeVry Univ., Inc.*, 786 F.3d 559, 564 (7th Cir. 2015) (noting recent decisions questioning the distinction, but nonetheless proceeding under the direct method of proof).

December 28, 2010, and March 2, 2011.[5] The indirect method of proof requires identifying similarly-situated co-workers who did not engage in protected activity and were treated more favorably; by failing to identify any, Carothers has waived this analysis. *See Brown v. Advocate S. Suburban Hosp.*, 700 F.3d 1101, 1106 (7th Cir. 2012) (citing *Harper v. C.R. England, Inc.*, 687 F.3d 297, 309–10 (7th Cir. 2012)). Thus, we will examine Carothers' claim under the direct method of proof.

Under the direct method of proof, Carothers must show: (1) she engaged in a statutorily protected activity; (2) she suffered a materially adverse action; and (3) the Defendants' desire to retaliate was the but-for cause of the adverse action. *See Sklyarsky v. Means-Knaus Partners, L.P.*, 777 F.3d 892, 898 (7th Cir. 2015) (citations omitted); *see also Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 133 S. Ct. 2517, 2533 (2013) (holding that Title VII retaliation claims must be proven under "traditional principles of but-for causation"). In this case, Carothers' arguments fail because she does not establish any causal link between the adverse employment actions and her protected conduct.

Regarding the worker's compensation claim, Carothers includes a laundry list of adverse employment actions she claims were retaliatory. Specifically, she claims that Anderson's refusal to allow her to return to work after her injury, Carothers' lack of responsibilities assigned to her on her first

---

[5]   There is a discrepancy between Carothers' second amended complaint, which claims retaliation for filing a discrimination complaint on July 22, 2009, and her argument in response to Defendants' summary judgment motion and on appeal, which claims retaliation for filing complaints on December 28, 2010, and March 2, 2011.

day back to work, the fact that items were missing from her desk, the reassignment to performing data entry functions, being precluded from participating in her department's weekly meetings with Earl Dunlap, and Kern's refusal to approve Carothers' requested time off for her doctor's appointments were all in retaliation for Carothers filing a worker's compensation claim. But Carothers fails to present any evidence connecting any of these perceived slights to her worker's compensation claim. As a result, she has failed to satisfy the causation element. *See Chaib v. Indiana*, 744 F.3d 974, 987 (7th Cir. 2014) (affirming summary judgment where employee failed to show that any of the adverse employment actions she endured were caused by her complaints to her employer).

Carothers also argues that Anderson retaliated against her after she filed her discrimination claims with the Illinois Department of Human Rights and the EEOC. Specifically, she claims that the JDC Human Resources Department prevented her from taking the "IMPACT" test, which was a prerequisite for applying to certain jobs on CareerBuilder**.** Carothers fails to cite to anything in the record indicating that the Human Resources Department prevented her from taking the test, nor is there any evidence that Anderson had anything to do with such a decision. Carothers' uncorroborated speculation does not prevent summary judgment. *See Ripberger v. Corizon, Inc.*, 773 F.3d 871, 882 (7th Cir. 2014) (finding that plaintiff could not establish causation for retaliation claim when she "provided nothing beyond her own speculation that [her superintendent] had some 'say so' in the decision-making") (citation omitted).

### III.  CONCLUSION

For the foregoing reasons, the decision of the district court is AFFIRMED.