<u>NOT RECOMMENDED FOR FULL-TEXT PUBLICATION</u>
File Name: 19a0139n.06

Case No. 18-5303

## UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

| | | |
|---|---|---|
| CINDY TINSLEY, | ) | |
| Plaintiff-Appellant, | )<br>) | |
| v. | )<br>) | ON APPEAL FROM THE UNITED<br>STATES DISTRICT COURT FOR |
| CATERPILLAR FINANCIAL SERVICES,<br>CORP. | )<br>)<br>) | THE MIDDLE DISTRICT OF<br>TENNESSEE |
| Defendant-Appellee. | )<br>) | |

**FILED**
Mar 20, 2019
DEBORAH S. HUNT, Clerk

BEFORE: MOORE, CLAY, and DONALD, Circuit Judges.

**BERNICE BOUIE DONALD, Circuit Judge.** This case is about an employee, Cindy R. Tinsley, whose distaste for her supervisor's managerial decisions was so severe—particularly the fact that he permitted her co-workers to bounce stress balls off the ground—that it triggered her post-traumatic stress disorder ("PTSD"). Tinsley asked her employer, Caterpillar Financial Services ("Caterpillar"), to assign her to a new supervisor or to permit her to take medical leave. Caterpillar approved eighteen weeks of intermittent medical leave for Tinsley, but denied her request for a new supervisor or additional leave. Tinsley eventually resigned, and filed a lawsuit against Caterpillar.

In her lawsuit, Tinsley alleges that the company discriminated against her in violation of the Americans with Disabilities Act ("ADA") by failing to accommodate her disability and constructively discharging her. The record does not support these claims, though, because she is

not disabled under the ADA. Tinsley argued below and repeated at oral argument that her PTSD limited only her ability to perform the major life activity of "work," but she has not shown that her PTSD substantially limited her from performing a class of jobs or broad range of jobs, as is required by the ADA. She is thus not eligible for ADA relief. We **AFFIRM** the district court's entry of summary judgment in favor of Caterpillar on those claims.

Tinsley also claims that she received a negative performance review and was placed on an improvement plan in retaliation for taking leave pursuant to the Family Medical Leave Act ("FMLA"). Because receiving a negative performance review and being placed on an improvement plan would dissuade a reasonable employee from taking FMLA leave, and because the adverse employment action occurred just over two months after the protected activity, Tinsley has satisfied her prima facie showing for her retaliation claim. Caterpillar is required, therefore, to provide a legitimate, non-discriminatory reason for the adverse employment action. Because Caterpillar did not provide such a reason before this Court, we **REMAND** to the district court to determine whether Tinsley may continue with her retaliation claim.

## I. BACKGROUND

Tinsley worked for Caterpillar from 1997 until she tendered her resignation effective January 11, 2016. Beginning as a paralegal, she eventually moved to the business side of the company and was promoted to a Business System Analyst III position in October 2013. In this new role, she was paired with a group of other employees on the Four Pillars Project ("FPP"). Her immediate supervisor was Amy Clendenon, the FPP team leader, who in turn reported to Paul Kaikaris. Tinsley apparently worked without incident on the FPP team for two years. That changed in April 2015. [1]

---

[1]All further dates are in the year 2015, unless otherwise noted.

On April 15, Tinsley emailed Kaikaris and asked to be removed from the FPP because her family obligations had changed and her "many [work] responsibilities . . . [were] causing [her] to be stressed beyond what [she was] physically able to handle." Those factors, according to Tinsley, "negatively impact[ed her] work, sleep and overall health." In response to the email, Kaikaris met with Tinsley and said he would see what he could do to take work off her plate.

On April 21, Tinsley submitted a doctor's note from her personal physician indicating that she "should be excused from work [between April 21 and April 24] because of [a] confidential medical condition." Tinsley took those days off and returned to work the following Monday, April 27. This period of leave—which Caterpillar represented at oral argument was taken pursuant to FMLA—forms the basis of Tinsley's FMLA retaliation claim. On May 4, Kaikaris and Clendenon met with Tinsley and reassigned some of her projects to another employee in response to her concerns. Tinsley later wrote in an email to Human Resources that this reassignment "greatly reduced" her stress.

A little over two months later, in early July, Kaikaris and Clendenon met with Tinsley informally to explain that they were concerned with her recent performance at work: specifically, that she was not following the prescribed methodology for completing her work, the quality of her work was subpar, and she had been leaving work early without prior approval. Tinsley was defensive at this meeting and unreceptive to the issues raised by her two supervisors.

About a week later, Kaikaris and Clendenon met with Tinsley again, this time for her formal mid-year review. Based on the same issues raised in the informal meeting, Tinsley received a rating of "Did Not Meet Performance Expectations." Despite the negative rating, Kaikaris noted in the review that he believed Tinsley's performance issues were an "anomaly" and she could

"return to an expected level of performance by year-end" with the implementation of an action plan.

On August 14, Kaikaris provided Tinsley with a Performance Improvement Plan ("PIP"), as is required when an employee receives the "Did Not Meet Performance Expectations" rating. Tinsley refused to sign the PIP because she "disagreed with it" and did not feel that she had been "assessed accurately." She believed that Kaikaris provided her a poor rating only because she had complained to him during a routine meeting in early July that she did not approve of her co-workers bouncing stress balls off the ground.

After she refused to sign her PIP, Tinsley sent two emails to Human Resources regarding the stress of her position, her purportedly inaccurate midyear review, and the "hostile work environment" created by her co-workers' "horseplay" (e.g., bouncing the stress balls off the ground). In the first email, sent August 17, Tinsley expressed that she was concerned that Kaikaris' "demeanor towards [her] changed after" the meeting in which she complained about the bouncing stress balls and that she did not "feel comfortable continuing to work under [Kaikaris'] supervision." Accordingly, she asked to "be restored to [her] former support manager role in the NABC Special Accounts group at the earliest opportunity." In the second email, sent two days later, Tinsley explained that she "could not even begin to comprehend how [she] could possibly continue" to work in the FPP based on the stress she felt from "unreasonable deadlines" and because Kaikaris announced that the FPP employees' work hours and responsibilities would be enlarged for a special event. These factors caused "complete mental and emotional exhaustion," according to Tinsley, and were the reason why her doctor had provided her with a note to take time off in April.

Despite the picture of overwhelming stress Tinsley painted, she also outlined in her second email to Human Resources the ways in which the company had been working with her to accommodate her requests: specifically, that she met with Kaikaris several times over the preceding months regarding her concerns, that he promised to make changes to her schedule and work flow, and that he "greatly reduced" her stress level by reassigning some of her projects to other team members in May. Moreover, Human Resources investigated Tinsley's allegations, speaking with several senior leaders, Kaikaris' manager, and the Chief Information Officer, but ultimately concluded that Tinsley's mid-year rating and workload were "appropriate" and that "appropriate action had been taken."

After this round of complaints and responses, Tinsley began a practice of submitting doctor's notes and successive requests for medical leave based on "mental and emotional duress brought on by an over-excessive workload, unrealistic deadlines, a hostile work environment and a manager's reckless indifference to my mental and emotional well-being." Following her doctor's advice, she took medical leave between September 2 and October 7. On October 6, though, her doctor cleared her to return to work—"at full capacity"—in a letter that stated:

> I've been following [Tinsley] for the last 4-6 weeks for exacerbation of her post-traumatic stress disorder. She has been working with a psychologist by going to counselling sessions. At this time, she has stabilized medically. In my opinion she is able to return to work effective October 7, 2015 and function at full capacity. However, I strongly recommend her working in a different work environment and specifically under a different manager. She describes a work environment and management style that was insensitive and at times hostile. To return to such an environment would put her [at] significantly increased risk for another exacerbation.

On October 7, Tinsley reported back to work and immediately met with a Human Resources employee to complain again about her work environment and to request a new supervisor. When questioned about options she was comfortable with, Tinsley told Human

Resources that she would be willing to continue working in the same position as long as it was under a different manager with whom she was more familiar. In lieu of reassigning her to a new supervisor, however, the company approved her request to take an additional eight weeks of medical leave, starting on October 9. Including this time off, the company had provided her with eighteen weeks of FMLA leave—six weeks beyond the statutory maximum, *see* 29 U.S.C. § 2612(a)(1)(D). Tinsley took the extra eight weeks of medical leave, plus more.

Beginning in the middle of December, the record conveys a pattern—the minute details of which are not important to the resolution of this case—wherein Tinsley requested additional medical leave and a new supervisor, and Caterpillar denied those requests. Around this time as well, Tinsley filed a "Charge of Discrimination" with the Tennessee Human Rights Commission alleging that she was "subjected to a hostile environment by supervision because of [her] disability and complaints of discrimination and harassment," and making clear that the "only" accommodations she requested from her employer were "additional time off while under [her] doctor's care and to report to a different supervisor."

On January 7, 2016, Caterpillar put an end to Tinsley's requests, informing her that it could not accommodate her "confidential" medical condition and that it did not believe that her request for a transfer to a different supervisor was necessary or a reasonable accommodation. The next day, Tinsley again asked for additional leave, to which human resources responded that she was expected to return to work. Tinsley replied that the company had "given [her] no other alternative, [and to] please process [her] retirement effective 1/11/2016." The company processed her retirement according to her request.

Tinsley filed a complaint against Caterpillar in district court on June 14, 2016, alleging that Caterpillar violated the ADA by not providing her with reasonable accommodations and retaliated

against her for making an FMLA claim. Following discovery, which included depositions of Tinsley, Kaikaris, and a Caterpillar Human Resources representative, Caterpillar filed a motion for summary judgment. Upon review of the evidence, the district court found that Tinsley was not disabled pursuant to the ADA because she is not substantially impaired from working in a broad category of jobs, and that Tinsley did not provide sufficient evidence to maintain her retaliation claim. Accordingly, the district entered summary judgment in favor of Caterpillar on both of Tinsley's claims. Tinsley filed a timely appeal of that order.

## II. ANALYSIS

### Standard of Review

We review a district court's grant of summary judgment de novo. *Gillis v. Miller*, 845 F.3d 677, 683 (6th Cir. 2017). To succeed on summary judgment, the movant must show it is entitled to judgment as a matter of law by identifying the evidence "which it believes demonstrate[s] the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (quoting former Fed. R. Civ. P. 56(c)). To avoid entry of judgment, the nonmovant "must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). "The mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Id.* at 247-48 (emphases in original).

### ADA Claim

Tinsley argues that Caterpillar violated the ADA by not providing her with reasonable accommodations for her disability. As the district court correctly held, however, Tinsley is not disabled for purposes of the ADA because she is not substantially limited from working in a class or broad range of jobs. "The ADA prohibits discrimination by covered entities, including private

employers, against qualified individuals with a disability." *Sutton v. United Air Lines*, *Inc.*, 527 U.S. 471, 477 (1999), superseded on other grounds by statute as stated in *Verhoff v. Time Warner Cable, Inc.*, 299 F. App'x 488, 494 (6th Cir. 2008). The ADA defines a disability, among other things, as "a physical or mental impairment that substantially limits one or more major life activities." 42 U.S.C. § 12102(1)(A). The ADA and this Court have recognized "work" as a major life activity. *Id.* at § 12102(2)(A), *Swanson v. Univ. of Cincinnati*, 268 F.3d 307, 317 (6th Cir. 2001). Although Tinsley has a disability—PTSD—she has not demonstrated that her disability "substantially limits" her from "work," as that term is understood vis-à-vis the ADA.

This Court has previously held that to be substantially limited from working—and thus eligible for ADA protection—an individual must be "significantly restricted in the ability to perform either a class of jobs or a broad range of jobs in various classes as compared to the average person having comparable training, skills and abilities." *Swanson*, 268 F.3d at 317 (citation omitted). Following this Court's decision in *Swanson*, Congress enacted the ADA Amendments Act of 2008, which relaxed the definition of "substantially limited" and noted that establishing a qualifying disability is not meant to be a demanding standard. *See* 42 U.S.C. § 12102(4)(A) ("The definition of disability in this chapter shall be construed in favor of broad coverage of individuals under this chapter."); 29 C.F.R. § 1630.2(j)(1)(ii) ("An impairment need not prevent, or significantly or severely restrict, the individual from performing a major life activity."); ADA Amendments Act of 2008, Pub. L. No. 110-325, 122 Stat. 3553 (noting that cases interpreting the ADA "have narrowed the broad scope of protection intended to be afforded by the ADA"). Following the Amendments, the Code of Federal Regulations no longer specifies the requirements for concluding that an individual's disability impacts the major life activity of working, as it had at the time *Swanson* was decided. *See Swanson*, 268 F.3d at 317 (quoting 29 C.F.R.

§ 1630.2(j)(3)(i) and explaining that a disability must restrict a person from performing "a broad range of jobs"). Additionally, due to the broader definition of "substantially limited" under the Amendments, the interpretative guide produced by the Equal Employment Opportunity Commission ("EEOC") notes that the major life activity of working "will be used in only very targeted situations" to determine whether an individual is disabled. 29 C.F.R. § 1630 Appendix.

In such "targeted situations," however, the EEOC has largely endorsed the pre-Amendments analysis for determining whether a person's claimed impairment sufficiently impacts the major life activity of "working." Specifically, the EEOC's interpretive guide explains that an individual who asserts that she is disabled because she is unable to perform the major life activity of "working" must still show that "the impairment substantially limits . . . her ability to perform a class of jobs or broad range of jobs in various classes." *Id.* The EEOC further states that "[d]emonstrating a substantial limitation in performing the unique aspects of a single specific job is not sufficient to establish that a person is substantially limited in the major life activity of working." *Id.* Thus, to the extent the Amendments have altered the scope of the ADA's protections, a plaintiff who asserts that her impairment substantially limits the major life activity of "working" is still required to show that her impairment limits her ability to "perform a class of jobs or broad range of jobs." *Id.*; *see also Mancini v. City of Providence*, 909 F.3d 32, 40 & 42 n.6 (1st Cir. 2018) (noting the Amendments applied and that in order to show the plaintiff was substantially limited in performing the major life activity of working, he was required to show it limited his "ability to perform a class of jobs or broad range of jobs" (internal quotation marks omitted)); *Carothers v. County of Cook*, 808 F.3d 1140, 1147–48 (7th Cir. 2015) (same).

As applied to the case before us, Tinsley has asserted that her impairment (PTSD) impacted only the major life activity of working. Tinsley's counsel reiterated this at oral argument. Thus,

we must now examine whether Tinsley's PTSD sufficiently limited her ability to perform a class of jobs or a broad range of jobs. The evidence demonstrates that it did not. As the district court correctly pointed out, the record is replete with undisputed evidence showing that Tinsley's issues stemmed directly from Kaikaris' management style as opposed to the responsibilities of a broad range of jobs. The clearest example of this is when Tinsley told Human Resources that she would be able to continue in the same position so long as she was under the direction of a different supervisor because her disability was triggered by "the way [Kaikaris] managed . . . with all the ball bouncing." There are several other pieces of evidence pointing to the same thing. For instance, on August 19, when Tinsley emailed Human Resources to request a new position, she explained that "the work itself was not the primary issue." And in the Charge of Discrimination she filed with the Tennessee Human Rights Commission, Tinsley wrote that the company could have accommodated her disability by switching her supervisor. Last, her doctor cleared her to return to work at one point "at full capacity," suggesting only that the company switch her supervisor to alleviate any medical concerns. Tinsley's diagnosis does not limit her ability to work a broad class of jobs; rather, it relates solely to her ability to work under a specific manager. Accordingly, she is not "disabled" pursuant to the ADA and was thus not entitled to a reasonable accommodation of additional time off or a transfer.

In response, Tinsley asserted at oral argument that her PTSD substantially limited her ability to perform a broad range of other, high-stress positions. However, the record evidence does not support this conclusion. "A class of jobs may be determined by reference to the nature of the work that an individual is limited in performing (such as commercial truck driving . . .) or by reference to job-related requirements that an individual is limited in meeting (for example, jobs requiring repetitive bending . . .)." 29 C.F.R. § 1630 Appendix.

> For example, if a person whose job requires heavy lifting develops a disability that prevents him or her from lifting more than fifty pounds and, consequently, from performing not only his or her existing job but also other jobs that would similarly require heavy lifting, that person would be substantially limited in working because he or she is substantially limited in performing the class of jobs that require heavy lifting.

*Id.* In the current case, although Tinsley would, theoretically, face similar limitations in another stressful position, she has consistently related her stress level to Kaikaris' specific management style, not to the requirements of the job.

Importantly, Tinsley's physician cleared Tinsley to return to work *without* restrictions. The only recommendation that Tinsley's physician made—to have Tinsley transfer to a different supervisor—related to her stress level under Kaikaris specifically. This is further illustrated by the fact that, when offered the same position under a different supervisor, Tinsley agreed that she would be able to perform the job duties. Thus, Tinsley's limitations were more accurately a product of the "unique aspect" of her "single specific job," i.e., working as an analyst under Kaikaris' particular management style. *Id.* Although we can certainly theorize a case in which an employee's disability actually limited her from engaging in a broad range of similarly high-stress positions, Tinsley has not pointed to any record evidence permitting us to make that necessary inference. *See Carothers*, 808 F.3d at 1148 (concluding that, because the record evidence indicated only that the plaintiff could not work with juvenile children, rather than children in general, the plaintiff was not disabled under the ADA). Because Tinsley has consistently phrased her limitation in terms of Kaikaris' specific management style, she has not shown that she was substantially limited in performing "either a class of jobs or broad range of jobs in various classes." 29 C.F.R. § 1630 Appendix.

Finally, Tinsley contends that "[t]o leave the District Court's opinion in place would be to allow employers the ability to deny employees the recognized accommodation of job/shift assignments and then successfully defend legal claims by arguing the employee was only restricted from performing one job in their employment." Appellant Br. at 19–20. This argument ignores the fact that Tinsley has articulated her claim only in terms of how it impacts her ability to perform the major life activity of working. Although Tinsley could have conceivably articulated her claim in terms of other, non-work-related life activities, Tinsley has identified only the major life activity of working. As both our precedent and the EEOC's interpretative guide show, in the "targeted situation" where an employee asserts that her impairment substantially impacts the major life activity of working, that employee must also show that her impairment prevented her from performing a class of jobs or broad range of jobs in various classes. For the reasons discussed above, Tinsley has failed to make that showing; thus, she is not disabled under the ADA.

## FMLA Retaliation

Tinsley next argues that Caterpillar gave her a negative mid-year review and placed her on a performance improvement plan as retaliation for taking FMLA leave. To move forward on her claim, she must make the following prima facie case: (1) she availed herself of a protected right under the FMLA, (2) she was adversely affected by an employment decision, and (3) there was a causal connection between the exercise of the right and the adverse employment decision. *Skrjanc v. Great Lakes Power Serv. Co.*, 272 F.3d 309, 314 (6th Cir. 2001). Tinsley has made this prima facie showing. First, the parties do not dispute that she had a right to take FMLA leave in April 2015. Second, when drawing all reasonable inferences in favor of Tinsley, her negative review and performance improvement plan—which itself stated "could result in reassignment, demotion, and/or disciplinary action, up to and including discharge"—would have dissuaded a

reasonable worker from making a similar request. It is therefore an adverse employment action. *See Rogers v. Henry Ford Health Sys.*, 897 F.3d 763, 775–76 (6th Cir. 2018) (quoting *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006)). Indeed, Caterpillar should be aware of this. *Michael v. Caterpillar Fin. Servs. Corp.*, 496 F.3d 584, 594–96 (6th Cir. 2007) (concluding that a paid administrative leave and a 90-day improvement plan was sufficiently adverse to establish a prima facie case of race retaliation). Third, we have previously found that, if the adverse employment action closely follows the protected activity, then temporal proximity alone is sufficient to satisfy the causation prong, *Mickey v. Zeidler Tool & Die Co.*, 516 F.3d 516, 529 (6th Cir. 2008), including time periods of just over two months, *Rogers*, 897 F.3d at 776–77, two-to-three months, *Seeger v. Cincinnati Bell Tel. Co.*, 681 F.3d 274, 283–84 (6th Cir. 2012), and three months, *Bryson v. Regis Corp.*, 498 F.3d 561, 571 (6th Cir. 2007). Tinsley received her adverse employment action just over two months after she initially took FMLA leave. Satisfying all three elements, she has made her prima facie showing.

When a plaintiff makes her prima facie showing, the defendant must respond by clearly articulating a legitimate non-discriminatory reason for the adverse employment action. *See Bryson*, 498 F.3d at 570. Caterpillar has not addressed this issue in its appellate briefing. In such situations, remand is appropriate. *Randolph v. Ohio Dep't of Youth Serv.*, 453 F.3d 724, 737 n.4 (6th Cir. 2006). We thus remand to the district court to examine whether Tinsley may move forward with her FMLA retaliation claim.[2]

---

[2]Tinsley also argues, in curt treatment, that the district court "erred in finding as a matter of law that [her] forced retirement claim should be dismissed." She cites a single case—*Talley v. Family Dollar Stores of Ohio, Inc.*, 542 F.3d 1099 (6th Cir. 2008)—for the proposition that Caterpillar failed to accommodate her disability. But, unlike the plaintiff in *Talley*, Tinsley is not disabled pursuant to the ADA. Her constructive discharge claim thus fails.

### III. CONCLUSION

For the aforementioned reasons, we **AFFIRM** the district court's order granting summary judgment in favor of Caterpillar on Tinsley's ADA and forced retirement claims, but **REMAND** for further consideration of Tinsley's FMLA retaliation claim.